## Evans *versus* The Philadelphia Club.

*Amotion and disfranchisement of members of private corporations, discussed and distinguished.*

| 50 | 107 |
| 135 | 321 |
| 50 | 107 |
| 26 SC | ¹419 |
| 50 | 107 |
| 32 SC | ³520 |

1. The power of amotion for adequate cause is an inherent incident of all corporations, whether municipal or private, except, perhaps, such as are literary or eleemosynary; but the exercise of this power does not affect the private rights of the corporator in the franchise.

2. The power of disfranchisement which does destroy the member's franchise, must in general be conferred by statute, and is never sustained as an incidental power except on conviction of the member in a court of justice for an infamous offence, and for the commission of some act against the society which tends to its destruction or injury.

3. Though the power to make by-laws is incidental to corporations and is generally expressly conferred by statute, yet by-laws which vest in a majority the power of expulsion for minor offences are, in so far, void, and expulsions made under them will not be sustained in courts of justice.

4. In joint stock companies or in any corporation owning property, no power of expulsion can be · exercised unless expressly conferred by the charter.

5. Where two members of a private corporation or club were sitting together in conversation in the bar-room of the club-house, a third came in and used insulting language, understood by one of the two to be applied to himself, who thereupon struck the offender: the act was held not such as would justify his expulsion from the club, by the members thereof.

CERTIFICATE from the Court at *Nisi Prius*.

This was a proceeding by Rowland E. Evans against The Philadelphia Club, commenced by a petition of the relator January 30th 1864, in which he set forth that he was, on the 1st day of June 1863, and for a long time previously thereto had been, a member of The Philadelphia Club, which was incorporated by an Act of Assembly of this Commonwealth, approved the 9th day of May 1850, under the name of " The Philadelphia Association and Reading-Room," with authority to elect officers, to establish by-laws for their government, and to hold real estate not exceeding in yearly value three thousand dollars, and that the name was subsequently duly changed to The Philadelphia Club:

That the corporation owns certain real estate, and has its only place of business within the city and county of Philadelphia.

That he was, many years ago, duly made a member of the said corporation, and as such had and has a right and interest in the said real estate and property, and has always, since his becoming a member as aforesaid, until the time of the grievance hereinafter complained of, enjoyed the benefits and exercised the privileges of such membership, and has committed no act by reason of which he could justly be deprived of his said right and membership.

That on or about the 19th day of May 1863 he received a printed notice, stating that a special meeting of the said corporation would be held on the 1st day of June then next, to take into consideration " the circumstances of an alleged violation by Row-

[Evans *v.* Philadelphia Club.]

land E. Evans of his duty as a corporator, by being guilty of disorderly conduct within the walls of the club, in offering a blow to Samuel B. Thomas, one of its members, on the evening of the 24th of February 1863, and the propriety of expelling the said Rowland E. Evans from his membership of the club, he having been heretofore, to wit, on the 7th of March 1863, requested by the board of direction to resign from the club, by reason of such conduct, and having thereupon refused so to do. By order of the board of direction, and signed M. EDWARD ROGERS, Secretary;" and that at a meeting so held on the 1st day of June 1863, certain proceedings were had by which a certain number of the persons then and there present undertook to pass and passed a resolution to expel him from his membership of the said club, and to deprive him of his rights as a member and corporator thereof, and that he was subsequently notified by the said corporation, or by some one on its behalf, of his said expulsion or attempted expulsion and deprivation of membership.

He then averred that by reason of the premises his said attempted expulsion and deprivation was unjust, illegal, and contrary to the rules and laws by which corporations are governed and controlled, and that he has been greatly wronged and injured in being deprived of his rights of membership of the said corporation as aforesaid ; and praying for a writ of *mandamus* to be directed to the said The Philadelphia Club, commanding it forthwith to restore him to the exercise of his rights of a member and corporator of the said corporation, or to show cause if any it has why he should not be restored to his rights as aforesaid.

On the 30th of January 1864 a writ of alternative *mandamus* was sued out, to which the defendants filed a return, in which they admitted their incorporation and change of name, as stated in the petition of the relator.

They further averred that for more than twenty years before the passage of this act, the Philadelphia Club had existed as an unincorporated association, was originally formed solely for purposes of social intercourse, and never had any other end or purpose either before or since its incorporation. That its existence and continuance required the adoption of, and the strict compliance with, certain rules of internal discipline, regulating the intercourse of its members, and that they had established certain by-laws for this purpose, which provided that the affairs of the club should be managed by a board of direction, consisting of the president and six directors, who should be elected at the stated meeting in April in every year, who should have and exercise a general superintendence of the affairs of the club, control and manage its property and effects, and enforce the preservation of order, and obedience to the rules.

That the said by-laws provided that if the conduct of a member

[Evans *v.* Philadelphia Club.]

should be disorderly, or injurious to the interest of the club, or contrary to its by-laws, the board should inform him thereof in writing, and if the nature of the offence require it, should request him to resign; and that should such information or request be disregarded,.the board should refer the matter to the next stated meeting of the club, or to a special meeting to be called for the purpose, of which due notice should be given to the offending member; at which meeting the circumstances of the case should be considered, and the member might be expelled.

That the sixty-eighth by-law provided that the board of direction, by a unanimous vote by ballot of all its members, might expel a member of the club for an infraction of either of the by-laws numbered 28, 58, and 73, or for intentional violation of the by-laws relating to the ballot, or for other gross misconduct, immediate notice of which expulsion should be given him. Such expulsion should be final, unless reversed by a special meeting of the club, which, at the written request of the member so expelled, made within thirty days thereafter, should be called by the board. A copy of the notice of the said meeting should be sent to the offender, who should have the right to be present and to be heard thereat.

That the thirty-ninth by-law provided that all interest in the property of the club, of members resigning, or otherwise ceasing to be members, should be vested in the club.

That the by-laws regulating meetings of the club were and are, so far as respects the present case, as follows:—

The fourteenth provided that notice of every meeting of the club, whether stated or special, should be posted upon the notice-board at least ten days before the time assigned for such meeting.

The next provided that it should be the duty of the board to call a special meeting of the club, upon the written request of ten members, and such a meeting might also be called whenever the board might deem it expedient.

The next provided that the notice of a special meeting should specify the time, and also the purpose for which it might be called; and such meeting should not consider or take action on any matter other than that specified in said notice.

The next provided that at any meeting of the club for action on the conduct of a member, which might involve his expulsion, or for an alteration of the by-laws, one-fourth of the whole number of the members of the club should be a quorum.

And the twentieth provided, that a motion involving the expulsion of a member, should be decided by ballot, and the decision of a majority should be final.

The defendants annexed a copy of all the by-laws of the club, which they prayed might be taken as part of their return; and averred further " that the club owns no other real estate than its club-house.

[Evans *v.* Philadelphia Club.]

" That the relator was elected a member of the club in the year 1848, and became a member thereof, and thereby bound himself to the observance of such by-laws as had been established for its government.

" That on the evening of the 24th of February 1863, the defendant was guilty of breaking the sixty-fifth by-law, by having an altercation within the walls of the club-house, with Samuel B. Thomas, another of its members, and by striking him a blow. An investigation of the case by the board of direction, after due notice to the relator, and hearing and considering all the circumstances of the case as detailed in writing by the relator, by the said Samuel B. Thomas, and by all the eye-witnesses of the transaction, resulted in the request from the board to the relator, that he should resign his membership of the club. This the relator declined to do. Whereupon a special meeting of the club was called on the 23d of March 1863, the object of the call being stated to be, ' to take into consideration the refusal of a member to resign from the club, on the request of the board of directors, as provided for in by-laws 65 and 66.' At the meeting so called, certain proceedings were had (the whole of which are set forth in the exhibits annexed hereto), which resulted in the expulsion of the relator from his membership.

" That upon his said expulsion, the relator obtained from the Court of Common Pleas of Philadelphia county a writ of alternative *mandamus*, commanding the defendants to restore him to his rights and privileges as a member of the club, or to show cause why the same should not be done. To which writ the defendants filed their return, to which the relator demurred.

" That on the 16th of May 1863, the said court gave judgment for the relator on the demurrer, and granted his prayer for a peremptory *mandamus*, on the ground that although the conduct of the relator had been such as to warrant his disfranchisement, yet that his mere refusal to resign, upon the request of the board of direction, was not, of itself, a ground of expulsion within either the express or the inherent powers of the charter, and the meeting of the club having been called for the sole purpose of taking action upon such refusal to resign, its proceedings, which resulted in such expulsion, were irregular.

" That the defendants were advised to comply with the said decision, and without testing its correctness by removing the proceedings to this court, to restore the relator to his membership', and take new action in the case ; and, that at a special meeting, therefore, of the board of direction, held on the 18th of May 1863, a quorum being present, it was resolved that the secretary be requested to inform the relator, that, in obedience to the decision on the 16th day of that month, of the Court of Common Pleas, in the case of The Commonwealth *v.* The Philadelphia Club, he was

[Evans *v.* Philadelphia Club.]

restored to his rights and privileges as a member thereof; and it was further resolved, that a special meeting of the club be called at the time and for the purpose mentioned in the following notice, to be posted upon the notice-board according to the by-laws: That notice of such meeting be given to the relator, and that such notice be accompanied by a copy of the testimony presented to the board of direction on the 7th of March 1863.

[The notice was the same which the relator in his suggestion admits to have received on the 19th of May 1863, as above.]

" That with this notice, the testimony which was before the club at the time of his first expulsion, consisting of letters from certain persons who were present when the alleged offence was committed, was sent to the relator.

" That notice of the meeting to be held on the 1st of June 1863 was duly given, and that a meeting consisting of over one hundred members was held, before whom the previous proceedings and the testimony were laid, read, and considered, after which a motion to expel was passed by a vote of sixty-eight to thirty-two of the members."

All which the defendants set forth as the cause for which the relator was disfranchised from his membership of the said corporation, and the proceedings by which this disfranchisement was effected; and prayed to be hence dismissed with their costs and charges.

To this return the relator demurred specially, and for cause of demurrer showed:—

I. That the said return does not set forth and show any power in the defendants to expel the said relator from the said Philadelphia Club.

II. That the said return does not set forth and show any sufficient grounds or cause for the expulsion of the said relator from the said Philadelphia Club.

III. That no specific act or offence whatsoever is charged in the said return against the said relator, or alleged to have been committed by him either against the said Philadelphia Club, or against the said relator's duty as a corporator thereof, by reason of which there was any ground, cause, or right to expel him from the said corporation.

IV. That the alleged proceedings under and by virtue of which the said relator was expelled from the said corporation, as set forth and shown in the said return, are wholly irregular and void:

1. Because the notice of the said meeting to be held on the 1st day of June 1863, should have been served upon and given to the members of the said corporation in person or specifically, whereas it does not appear in the said return that such personal or specific notice was given to the said members.

2. Because there was no proper examination made or proofs

[Evans *v*. Philadelphia Club.]

given at the said meeting, held on the 1st day of June 1863, of any offence committed or act done by the said relator, by reason of which he was expelled from the said corporation ; and

3. Because there was no conviction had or found at the said meeting, held on the 1st day of June 1863, of any offence committed or act done by the said relator, by reason of which he was expelled from the said corporation.

These proceedings raised the following questions :—

1. Had the defendants any power to expel the relator ?

2. Had the conduct of the relator been such as to justify an exercise of this power ? and

3. Were the proceedings, by which he was expelled, regular ?

These questions were argued at Nisi Prius on the 24th of February 1864, before the chief justice.   On the 11th of March, the learned judge (WOODWARD, C. J.) delivered the following opinion :

" This case touches the power of a private corporation to disfranchise one of its members, and it will be necessary and proper to examine, somewhat minutely, the authorities of the law bearing upon the point.

" The leading case upon this branch of law is that of James Bagg, decided in the reign of James I. (A. D. 1616), and reported in Coke's Reports, part xi., p. 93.   Bagg was one of twelve chief burgesses of the borough of Plymouth, in England, and having been guilty of the most scandalous and disorderly speeches to the mayor and his fellow burgesses, was expelled, but the King's Bench restored him by *mandamus*.   Among other things it was resolved, ' that no freeman of any corporation can be disfranchised by the corporation, unless they have authority to do it, either by the express words of the charter or by prescription ; but if they have not authority, neither by charter nor prescription, then he ought to be convicted by course of law before he can be removed.' And in support of this, Lord Coke quotes that famous clause of Magna Charta, beginning ' *Nullus liber homo*,' &c.

" Though much was said about disfranchisement in Bagg's case, it was really a case of amotion, and not of disfranchisement.   Bagg was removed from the office of burgess, and not expelled from the borough by the action of the corporation.   Mr. Willcock, in his excellent treatise on corporations, page 270, defines amotion as applicable only to officers, and says it causes · a cessation of the particular offices from which they are amoved, but in no manner affects their right to the freedom of the municipality ; whilst disfranchisement is applicable only to the freedom, and cuts off the corporator from all rights and privileges of the corporation.   It appears, he says, that there is *not* an incidental right in corporations to disfranchise their members, but it must be claimed by prescription or express grant of the charter.   For this he refers

[Evans v. Philadelphia Club.]

himself to Bagg's case, which, he says, has never been expressly overruled; the cases in which it has been questioned having been cases of amotion. He then goes on to make some general observations on the subject, all of which are so excellent, and some of which are so pertinent to the case in hand, that I am tempted to transcribe them. He says: 'At the time when James Bagg's case was before the court, their attention had been rarely attracted to the consideration of corporate causes, and the distinction between the right to the offices and the right to the freedom of a municipality had been little considered. The particular case was of amotion from office; the arguments were in general more applicable to disfranchisement. But there is a material difference in principle. The enjoyment of office is not for the private benefit of the corporator, but an honourable distinction which he holds for the welfare of the corporation, and therefore, though it be an office of a freehold nature, it is entirely conditional. * * * But the franchise of a freeman is wholly for his own benefit, and a private right; a right in the municipality similar to that of a natural subject in the state, of which he ought not to be deprived for any minor offence against his corporate fealty, any more than that for which, as a subject, he ought to be deprived of his franchise as a liegeman. For this reason, all minor corporate offences, *such as improper behaviour to his fellow-corporators*, where not punishable by the general law of the land, as well as violations of his corporate duties, ought to be punished by penalties imposed by the ordinances of the municipality, and not by disfranchisement. But such offences against the general law as occasion a forfeiture of all civil rights, import in themselves a forfeiture of the corporate franchise; and offences against the corporation which tend to its destruction, such as defacing the charters, altering the corporate records so as to destroy the evidence of their title to privileges, or that of the title of his fellow-corporators to their franchises, are of course causes of disfranchisement.'

" These observations relate to municipal corporations; but why are they not equally applicable to private corporations? The interest or ' freedom' which a member has in a private corporation is as truly a ' franchise' as that which any of the burgesses mentioned in Bagg's Case had in the borough of Plymouth, and may often be a much more valuable franchise. Where it has been obtained by the payment of a pecuniary consideration, and property is held in connection with it, it is a vested estate, and certainly ought not to be sacrificed on account of minor offences, which would not be permitted to forfeit individual interests in a municipal corporation. And if a power to disfranchise in a municipal corporation does not exist unless expressly granted, it is very safe to conclude that it is not inherent in a private corporation, and must have an express grant to support it.

14 Wr.—8

[Evans *v.* Philadelphia Club.]

" The extent to which Bragg's Case has been overruled is clearly indicated in Lord Bruce's Case, 2 Strange 819, which was a case of amotion, not disfranchisement, and where it was said ' the modern opinion has been that a *power of amotion* is incident to the corporation, though Bagg's Case seems contrary.' Richardson's Case, 1 Burr. 517, was amotion from a municipal office—that of portman of the borough of Ipswich. Lord Mansfield went very fully into the law of corporations, and whilst the amotion was not sustained, he sanctioned, very distinctly, the ' modern opinion' referred to in Lord Bruce's Case, and stated three sorts of offences for which an officer or a corporator may be discharged:

" ' 1. Such as have no immediate relation to his office ; but are in themselves of so infamous a nature as to render the offender unfit to execute any public franchise.

" ' 2. Such as are only against his oath and the duty of his office as a corporator, and amount to breaches of the tacit condition annexed to his franchise or office.

" ' 3. Such as are of a mixed nature, as being an offence not only against the duty of his office, but also a matter indictable at common law.'

" Of these distinctions, limited originally to municipal corporations, I shall have something to say hereafter, when I come to speak of them in connection with private corporations.

" In Earle's Case, Carthew 173, it was held that a member of a corporation cannot be disfranchised except for that which works to the destruction of the body corporate, or of the liberties and privileges thereof, *and not for any personal offence of one member to another.*

" Tidderly's Case, 1 Siderfin 14, was a question of restoring a municipal officer who had voluntarily resigned, and Chief Justice Hale held that every corporation had power to receive a resignation, and might, for good cause, amove.

" These cases are sufficient to reflect the opinion of the English courts on Bagg's Case. A more full reference to the authorities will be found in the notes to Willcock's chapter on disfranchisement, in his work on Corporations. The result seems to be, that the resolution I quoted from Bagg's Case has been so far modified that the power of *amotion* is inherent in the nature of corporations and not dependent upon prescription or charter, but the authorities do not establish the point that corporations have inherent power to *disfranchise* a private member. But Bagg's Case is an authority against the power of disfranchisement no farther than the reasonings therein are entitled to respect, for the point of the case had not reference either to private corporations or the power of disfranchisement. Whilst, therefore, the *very point* of the case may be regarded as overruled, the reasonings, as ex-

[*Evans v.* Philadelphia Club.]

pounded by Mr. Willcock, are such as to commend them to universal acceptance. Where corporations are founded upon private capital, the modern English cases are very unanimous in holding that no stockholder can be disfranchised, and thereby deprived of his interest in the property of the corporation, without an express authority for the purpose in the charter.

"In Pennsylvania, The Commonwealth *ex rel.* John Binns *v.* The St. Patrick Benevolent Society, 2 Binn. 441, is the leading case. The society, under a power conferred by its charter, made a by-law that vilifying a member by another member should be punished as a crime against the society, by removal from office, fine, or expulsion. Binns having been convicted of grossly vilifying a fellow-member, was expelled therefor under this by-law. The Supreme Court restored him upon *mandamus*, mainly on the ground that the by-law was not necessary for the good government and support of the affairs of the corporation—that it subjected the rights of membership to the uncertain will of a majority— that 'the offence of vilifying a member, on a private quarrel, is totally unconnected with the affairs of the society, and therefore its punishment cannot be necessary for the good government of the corporation.' Chief Justice Tilghman, delivering the opinion of the court, quoted Lord Mansfield's three sorts of offences as laid down in Richardson's Case, and said Binns's offence did not come within either of them, and he concluded by declaring that 'without an express power in the charter, no man can be disfranchised unless he has been guilty of some offence which either affects the interest or good government of the corporation, or is indictable by the law of the land.'

"In Fuller *v.* The Trustees of the Plainfield Academy, 6 Conn. 532, Judge Dagget alluded to the doctrine that a power of amotion is incidental to corporations, but seemed to doubt whether it was applicable to any but municipal corporations, and quoted Judge Story as saying in the Dartmouth College Case that there could be no amotion of the trustees of that institution, and he restored the trustee of the Plainfield Academy, who had been expelled for disrespectful and contemptuous language towards his associates, and for neglect of duty as a trustee. 'The court,' he said, 'cannot justify expulsion from office on such charges. What the trustee might have done to one of their number who had committed a crime which would banish him from society, it is not necessary to decide.' Another principle was asserted in this case, that the place of a trustee in an eleemosynary corporation, though no emoluments are attached to it, is a franchise of such a nature that a person improperly dispossessed of it is entitled to redress by *mandamus*. See also Dartmouth College *v.* Woodward, 4 Wheat. 676.

"In the case of Gray *v.* The Medical Society of Erie, 24

Barb. 570, a physician was asking to be restored to a society from which he had been expelled for violating a by-law that prescribed a tariff of fees for medical services. The Supreme Court of New York went very fully into the authorities upon corporate powers, and held that the power given to medical societies by statute to make by-laws and regulations relative to the admission and expulsion of members, was not an arbitrary or unlimited power, and that a by-law must be reasonable, and adapted to the purposes of the corporation.

" In the case of The Commonwealth *v.* Philanthropic Society, 5 Binn. 486, we have in our own courts what is very rare in the authorities, an instance of expulsion that was sustained. A member made a demand upon the society for relief agreeably to the rules of the institution, and presented a physician's bill which he had altered from $4 to $40, and which he claimed to have paid. Upon the ground that this was a scandalous crime, amounting almost, if not quite, to technical forgery, and that it was directly injurious to the society, his expulsion was supported.

" In The Commonwealth *v.* The Franklin Beneficial Association, 10 Barr 357, a member was restored who had been expelled for enlisting in violation of a by-law of the society.

" In The Commonwealth *v.* The German Society, 3 Harris 251, a society for ' mutual support and assistance,' the cause of disfranchisement was that the member had assisted, as president of the society, in defrauding it out of fifty cents, and had defamed and injured the society in public taverns. It was held not to be a sufficient cause, and he was restored.

" When the charter of the Butchers' Beneficial Association was presented to our Supreme Court, it was rejected on the ground, among others, that it allowed the association to expel members who should be ' guilty of actions which may injure the association.' This, said the chief justice, we cannot approve ; for it gives the association an entirely indefinite power over its members. For any action which may injure them they may expel, and therefore they may expel a member for becoming insolvent. It is totally incompatible with the whole spirit of our institutions, to clothe any body with such indefinite power over its members ; for it is equivalent to socialism, and is a rejection of all individual rights within the association. It is common in such charters to found the right of expulsion on the fact that the member has been found guilty of some crime on a trial in court, and this is quite proper : 11 Harris 151.

" In the case of The Beneficial Association of Brotherly Unity, 2 Wright 299, a charter was rejected because it gave a majority the power to expel any member ' guilty of an offence against the law'—the court holding that a constitution that puts all power over rights in the hands of a majority is no constitution at all.

[Evans *v.* Philadelphia Club.]

" Gathering now, into one group, the principles of decision that lie scattered through the authorities, they may be stated thus :—

" 1. That the power of amotion for adequate cause, is an inherent incident of all corporations, whether municipal or private, except, perhaps, such as are literary or eleemosynary, but the exercise of this power does not affect the private rights of the corporator in the franchise.

" 2. That the power of disfranchisement which does destroy the member's franchise, must, in general, be conferred by statute, and is never sustained as an incidental power, without statute grant, except in two cases—first, on conviction of the member in a court of justice of an infamous offence ; and second, where he has committed some act *against the society* which tends to its destruction or injury.

" 3. That the power to make by-laws is incidental to corporations, and generally expressly conferred by statute ; but by-laws which vest in a majority the power of expulsion for minor offences, are, in so far, void, and courts of justice will not sustain expulsions made under them.

" 4. In joint stock companies, ' or, indeed, in any corporation owning property' (Angell & Ames on Corporations, § 410), no power of expulsion can be exercised unless expressly conferred by the charter.

" With these principles in view, I take up the charter of the Philadelphia Club, and find that it was incorporated on the 8th May 1850, under the name of the ' Philadelphia Association and Reading-Room' (afterwards changed to that of the ' Philadelphia Club'), with authority to ' elect officers, to establish by-laws for their government, and to hold real estate, the yearly value of which shall not exceed three thousand dollars ;' but there is no power either of amotion or disfranchisement expressly conferred. They make no pretence to this power by prescription.

" The by-laws established by the corporation provide for the election of officers, and the order of proceedings, and fix ' the entrance-money' to be paid by resident members at $100, with a semi-annual subscription of $20 ; and for non-resident members at $50, with a semi-annual subscription of $15. The 65th, 66th, and 67th by-laws enact that ' if the conduct of a member be disorderly, or injurious to the interest of the club, or contrary to its by-laws, he shall be requested to resign, and if the request be disregarded, the board shall refer the matter to the next stated meeting of the club, and ' at such meeting the circumstances of the case shall be considered, and the member may be expelled.'

" The relator became a member of the club in 1848, and it is not alleged that he has failed to pay any of his dues, or perform any of his duties to the club, but the return alleges that on ' the evening of the 24th of February 1863, the defendant was guilty

[Evans *v.* Philadelphia Club.]

of breaking the 65th by-law by having an altercation within the walls of the club-house with Samuel B: Thomas, and by striking him a blow.' For this he was expelled.

"Now, undoubtedly, such conduct was disorderly; for though the objects and purposes of the society are not set forth in the charter, it is said to be a club for the cultivation of social relations, and these are friendly and kind relations, and are not promoted by such conduct as is imputed to the relator. But does a single instance of disorderly conduct justify disfranchisement? It is not alleged that the relator is a quarrelsome person, or habitually disorderly. On the contrary, it was admitted in argument that he is a respectable gentleman, and it is shown that when the offence occurred he was sitting in the bar-room of the club-house in quiet and friendly conversation with another person, when Thomas entered and uttered defamatory words which the relator understood to be applied to himself. It was therefore an assault upon Thomas provoked by himself. It was not an interruption of any deliberations or proceedings of the club in a state of organization—it occurred not in a reading-room, or an eating-room, nor at a card or billiard table, but in what is called the office or bar-room of the house.

"I look upon the occurrence as disorderly and injurious to the interest of the club, within the meaning of the 65th by-law, but as one of those 'minor offences,' of which Mr. Willcock speaks, and for which a majority have no power, even under the by-laws, to disfranchise a member. And upon the doctrine of the cases I have referred to, I hold the by-law void so far as it inflicts this extreme penalty for such an offence. I would be very sorry to say that anything short of a statute could confer on a majority of the members of any corporation power to expel a fellow-member for merely disorderly conduct. Talking or whispering in a reading-room, or wandering from the question in debate, or interrupting another when he is speaking, and very many mere breaches of good manners are disorderly, and injurious to such a club, and fit to be visited by reprimands and fines, but are not such offences against corporate duty as forfeit the franchise. Unless this unhappy occurrence be viewed through an atmosphere of passion and prejudice that shall distort and magnify its proportions, it must be regarded as belonging to the class of minor offences not punishable by expulsion. The relator's offence was not directed against the society, but against his fellow-member, as in Earle's Case and Binns's Case. The law affords no precedent for punishing an offence between fellow-members by disfranchisement. I am unwilling to make so bad a precedent of this case.

"But what is conclusive of this case is, that the corporation possesses property, real and personal, and is at liberty to accumulate more, until an annual revenue of $3000 comes to be enjoyed;

[Evans *v.* Philadelphia Club.]

and the re ator has purchased and paid for thé right to participate in that franchise. It is not a joint stock company at present, for under its by-laws no pecuniary profits are divisible among the members, but it may become so, and whether it does or not, the relator has a vested interest in its estate, and cannot be deprived of it by the proceedings that were had against him. On this point the authorities are clear, and without conflict. Nothing but an express power in the charter can authorize a money corporation to throw overboard one of its members. I have shown that the act of incorporation contained no such power. On the contrary, it excluded it, for the proviso reads ' that nothing herein contained shall be so construed as to authorize said Philadelphia Association and Reading-Room to do *any other act or acts* in their corporate capacity than are herein expressed.'

" For these reasons a peremptory *mandamus* must be awarded, and because the view I have taken of the case results in this conclusion, it is not necessary for me to discuss the formalities of the proceedings of the club under their by-laws, which led to the expulsion.

" Let a peremptory *mandamus* issue."

The case was then certified to the court in banc, where the judgment of the learned judge at Nisi Prius was assigned for error.

*William Henry Rawle* and *William M. Meredith*, for plaintiffs in error.—In this case four questions arise :—

I. Is the interest of the relator in the property of the club, as a moneyed corporation, such as he cannot be deprived of under its charter ?

The pleadings show that the club was originally formed, long before its incorporation, " solely for purposes of social intercourse, and it never had any other end or purpose, either before or since its incorporation ;" that " it owns no other real estate than its club-house," and that its 39th by-law provides that " all interest in the property of the club, of members resigning, or otherwise ceasing to be members, shall be vested in the club." This is admitted by the demurrer.

Private corporations are joint stock, or moneyed ; or corporations other than these, such as literary, religious, charitable, scientific, social, and the like. The broadest distinction has always existed between these two. A joint stock corporation is defined to be " such a corporation as has for its object a dividend of profit among its stockholders :" Angell & Ames on Corp. § 556. And a member thereof by original subscription or conveyance cannot be refused the rights and privileges of a member, and cannot be. disfranchised for any cause whatsoever " by a majority of the corporators, unless such power has been expressly conferred by the charter :" Id. § 113, 410, 411. All the cases cited by the authors

on this subject are those of " moneyed corporations." See also Commonwealth *v.* Philanthropic Society, 5 Binn. 486 ; Binns's Case, 2 Id. 441.

In the cases of literary, philanthropic, or social corporations, it is of the very essence of their usefulness that they should " own property." But this common feature does not therefore confuse them with moneyed corporations.

The court below conceived that the prohibition to the defendants " to do any other act or acts in their corporate capacity than are herein expressed," absolutely excluded the power of expulsion.

In another part of its opinion, the court below quoted with approbation the following language of Mr. Willcock : " Offences against the corporation which tend to its destruction, such as defacing the charters, altering the corporate records so as to destroy the evidence of their title to privileges, or that of the title of his fellow-corporators to their franchises, are of course causes of disfranchisement," and added, " These observations relate to municipal corporations, but why are they not equally applicable to private corporations ?"

And yet, upon the doctrine held below, if such corporations possess " any property," the interest of the member therein must prevent his disfranchisement, no matter what his conduct may have been. The effect of the affirmance of such a doctrine by this court upon the thousands of literary and philanthropic corporations which exist within this Commonwealth would be very serious.

A member under the by-laws may by resignation, voluntarily deprive himself of his interest in the property of the club. But if he cannot be deprived of it for any cause of misconduct, it must follow, and *a fortiori*, that he should not be deprived of it by the accident of his death ; which, however desirable, would, to some extent, interfere with the end and purpose which this corporation designed for itself.

II. Apart from the question of moneyed interest, had the defendants any right to expel the relator ?

It would seem to be reasonable to hold that the grant of corporate powers gave to the corporation the right to do all lawful things needful for its welfare—such right being variable according to the end and purpose for which the corporation was erected. From this it follows that the law will not deny to a corporation the right of disfranchisement when the exercise of that right is necessary to preserve the end and purpose for which the corporation was created.

It is believed that this proposition is supported by all the modern authorities. The court below based its decision upon the ruling in Bagg's Case, and the comments of Mr. Willcock upon it ;

and on Sir Thomas Earle's Case, decided in 1691, and reported in Carthew, p. 173.

How far are these cases law at the present day? 1. Neither of them were cases of disfranchisement—both of them were cases of amotion from office, and therefore all that was said about disfranchisement was mere *obiter dicta*.

2. These cases have been overruled as to the exact point decided, and doubted as to the *obiter dicta*. See Lord Bruce's Case, decided in 1728, and reported in 2 Strange 19, and The King *v.* Richardson, 1 Burr. 517–538.

In the present case the court below considered, that the result of the English authorities was, that although they now admit the power of amotion, "they do not establish the point that corporations have any inherent power to disfranchise a private member." Yet Lord Mansfield seemed not so to consider it when he said in the case of The King *v.* Richardson: "There are three sorts of offences for which an officer or corporator may be discharged," or when he said: "The cause was insufficient, the offence not being any of the three kinds for which a corporator could be disfranchised."

But if any doubt exist as to the result of the English cases, there is none as to American authority. See 2 Comm. 297. Also Angell & Ames on Corporations 411; The Commonwealth *ex rel.* John Binns *v.* The St. Patrick Benevolent Society, 2 Binn. 441; The Commonwealth *v.* Philanthropic Society, 5 Id. 487; Fuller *v.* The Trustees of the Plainfield Academy, 6 Conn. 532; The People *v.* The Medical Society of the County of Erie, 24 Barb. 570; Barrow *v.* The Massachusetts Medical Society, 12 Cushing 402.

If these cases are law, they establish the proposition contended for, that the law gives to a corporation the right of disfranchisement when the exercise of that right is necessary to preserve the end and purpose for which the corporation was created.

III. Was the conduct of the relator such as to bring his case within their jurisdiction?

The defendants were incorporated as "The Philadelphia Association and Reading-Room, with power to establish by-laws for their government." Apart from such an express grant of power, the corporation possessed it at common law: 2 Kent 296; Angell & Ames, § 325. What by-laws they might lawfully enact, depended upon the nature of the corporation. The pleadings admit that in this case "its sole end and purpose was the promotion of social intercourse." The mind almost involuntarily suggests the nature of by-laws necessary to promote this end. The rules which govern the intercourse of several hundred members meeting daily within the walls of a single house, may be different in kind from those which govern the officers and crew of a ship, but in their.

[Evans *v.* Philadelphia Club.]

way they require the same attention to discipline, and power to enforce obedience. The by-laws give to the board of direction (whose duty it is " to control and manage the property and effects, and enforce the preservation of order and obedience to its rules") a summary power of expulsion for violation of the by-laws prohibiting certain enumerated offences. The 65th by-law provides that "if the conduct of a member should be disorderly, or otherwise injurious to the interest of the club," he might be requested to resign, and in default thereof be expelled, &c.

The words "disorderly conduct" have a wide latitude, and that which would be proper at one time or place would be disorderly at another ; and, when applied to a " Philadelphia Association and Reading Room," or to a club formed solely for social purposes, have a very suggestive and well-defined meaning.

The relator's conduct came within the third class of causes enumerated by Lord Mansfield and Chief Justice Tilghman—it was " an offence against his duty as a corporator, and against the law of the land :" 3 Inst. 177, 140, 4 Bl. Com. 125.

This court will not undertake to discriminate nicely as to the exact weight of the offence. The corporation considered one instance of disorderly conduct sufficient to justify disfranchisement, and having had the jurisdiction, and exercised it in the manner usual to corporation courts, it is submitted that this court will not reverse the proceedings merely because it might differ from the defendants as to their judgment. See Ex parte Amy Long, 29 Eng. Law and Eq. Rep. 194 (Q. B. 1855) ; The Queen *v.* Grant, 14 Q. B. 43 ; The Queen *v.* Rowland. Evans, 3 E. & B. 367 ; The Queen *v.* Bolton, 1 Q. B. 66 ; The Black and White Smiths' Society *v.* Vandyke, 2 Whart. 309 ; The Commonwealth *v.* The Pike Beneficial Society, 8 W. & S. 247 ; Toram *v.* The Howard Beneficial Association, 4 Barr 519 ; The Commonwealth *v.* Green (the Presbyterian Church Case), 4 Whart. 599 ; German Reformed Church *v.* Seibert, 3 Barr 291 ; Taverner's Case, T. Raymond 447.

IV. Were the proceedings regular ?

The relator contends that they were not, because

1. The notice of the said meeting to be held on the 1st day of June 1863, should have been served upon and given to the members of the said corporation in person or specifically, whereas it does not appear in the said return that such personal or specific notice was given to the said members.

2. There was no proper examination made or proofs given at the said meeting, held on the 1st day of June 1863, of any offence committed or act done by the said relator, by reason of which he was expelled from the said corporation.

3. There was no conviction had or found at the said meeting, held on the 1st day of June 1863, of any offence committed or act

[Evans *v.* Philadelphia Club.]

done by the said relator, by reason of which he was expelled from the said corporation.

To these, it is answered,

1. The by-laws provide that " a notice of every meeting of the club, whether stated or special, shall be put upon the notice-board, at least ten days before the time assigned for such meeting ;" but in addition to this, the return shows that " a copy of the notice marked A., was sent, as far as was practicable, to every member."

2. Courts of review will not narrowly scan the proceedings of these corporation courts: The Queen *v.* Rowland Evans, 3 E. & B. 367. In this case there was no irregularity. The whole testimony of all the eye-witnesses was spread before the meeting. At the argument below it was asked by the learned chief justice, " Is there any case where a corporation court proceeded without the production of sworn testimony ?" It is answered that no case can be found where such testimony was ever deemed necessary ; and in this case it may be asked, who was authorized to administer an oath ? and if the witnesses had sworn falsely, how could they have been made liable to the pains and penalties of perjury ? This corporation court, though a judicial proceeding in one sense, was not so within the meaning of the statutes of perjury. See The Commonwealth *v.* The Philanthropic Society, 5 Binn. 486.

If this meeting had attempted to administer oaths to the parties, the members would have been themselves indictable for the misdemeanor at common law of administering unnecessary and extra-judicial oaths.

The proceedings of this corporation court were carefully regular in the following particulars :—

1. The notice to the relator of the proposed meeting was very full, and a copy of all the testimony was sent to him.

2. The notice of the meeting was also very full ; it contained the clause that the relator had been requested to resign, and had refused so to do, because the by-laws give the corporators no power of expulsion, unless after such refusal upon request. The words, " offering a blow," were those of the relator himself.

3. The notice was duly posted, and was also personally served.

4. The quorum was sufficient, being one hundred members out of one hundred and eighty-eight, whereas the by-laws only required one-fourth of the whole number of members, or forty-seven, to be present.

5. At the meeting, every word of testimony was read which had any connection with the case.

3. The conviction sufficiently appears in the resolution :—

" Whereas, Rowland E. Evans has violated his duty as a corporator of the Philadelphia Club, by being guilty of disorderly conduct within the walls of the club, in offering a blow to Samuel B.

[Evans *v.* Philadelphia Club.]

Thomas, one of its members, on the evening of the 24th of February 1863 ;

"Resolved, That the said Rowland E. Evans be therefore expelled from his membership of the club."

*G. W. Biddle* and *P. McCall*, for the defendant, argued I. That the club, owning property real and personal, could not expel the relator, the charter conferring no power of expulsion.

It is contended, on the other side, that this proposition holds good only in the case of joint stock corporations. But on what principle should it be confined to corporations having for their object a dividend of profits among the stockholders? The mere division of profits is not the criterion. The reason of the rule lies deeper than the mode of enjoyment of the property, whether by distribution of the profits or otherwise. It rests on the broad principle confirmed by Magna Charta, that no freeman shall be deprived of his property except by the judgment of his peers or the law of the land. If the corporation have power by their charter to expel, that will be *per legem terræ*—otherwise not. See Angell & Ames, § 410.

It is argued, on the other side, that literary and philanthropic corporations must "own property;" and if the interests of the members therein prevented their disfranchisement, the effect of the doctrine would be serious. It is believed, however, that the charters of these associations usually confer the power of expulsion. See the cases in 2 Binn. 441 and 5 Id. 486.

II. and III. As the charter confers no express power of expulsion, the whole question turns on the incidental power of the club to expel a member.

While the members of the club remained unincorporated, they could make regulations for their discipline *ad libitum*, involving, of course, expulsion. But the moment they obtained a charter, they parted with powers which they before possessed, and came under the law which governs corporate bodies.

The proposition advanced by plaintiffs in error that the grant of corporate powers gives the corporation the right to do all lawful things needful for its welfare, is at variance with the well-settled doctrine that a corporation possesses no powers which are not expressly delegated, or which are necessary to the exercise of expressly delegated powers. Does a corporation possess the incidental power of disfranchising a member ; and if so, in what cases? Disfranchisement and amotion are frequently confounded, although entirely distinct. Amotion is removal from office in a corporation. Disfranchisement is the taking away the franchise of being a corporator: Grant on Corp. 263. "Disfranchisement" applies to members. "Amotion" only to such members as are officers ; consequently, if an officer be removed for good cause, he may still

continue to be a member: Angell & Ames, § 408. It does not follow that, because a corporation possesses an incidental power of amotion, it therefore possesses an incidental power of disfranchisement.

While the decisions in Lord Bruce's Case, 2 Strange 19, and Rex *v.* Richardson, 1 Burr. 517, do, in opposition to Bagg's Case, hold the power of amotion to be inherent in public corporations, there is no case which extends this inherent power to disfranchisement. And therefore Mr. Willcock is right in his treatise on Municipal Corporations, p. 271, 16 Law Lib. 150.

As a Pennsylvania question, in the light of the decision of this court in Binns's Case, 2 Binn. 441, recognised in subsequent cases, it may be admitted that corporations possess an incidental power of disfranchisement in the three classes of cases enumerated by Lord Mansfield in 1 Burr. 538, viz.:

1. When an offence is committed, which has no immediate relation to a member's corporate duty, but is of so infamous a nature as renders him unfit for the society of honest men, such as perjury, forgery, &c., and then only after previous conviction by jury.

2. When the offence is against his duty as a corporator, and amounts to a breach of the tacit condition annexed to his franchise.

3. Where the offence is mixed, or compounded of the other two; that is to say, not only against his duty as a corporator, but also of an infamous nature.

The alleged offence of the relator in the case at bar does not fall within the first or third of these classes. Does it fall within the second class? The phrase "against his duty as a corporator" is vague, and the question at once is suggested, What are and what are not offences against the duty of a corporator, within the meaning of the rule authorizing disfranchisement? We are not without authority on this point. They are offences "that work to the destruction of the body corporate, or to the destruction of the liberties and privileges thereof." See Grant on Corp. 264; also, 24 Barb. 578; Bagg's Case; Yates's Case, Styles 477; Rex *v.* Mayor of Derby, Rep. Temp. Hardw. 153; 2 Bac. Abr. 476; and Lane's Case, 11 Mod. 270; Fortescue 275. Grant on Corp. 264, treating of offences against a corporator's duty, says: "At any rate, another part of what was laid down at the same time remains the law, viz., that a mere personal offence from one member to another is not a ground." See also, Buller N. P. 208, and Sir Thomas Earle's Case, Carth. 173.

The force of these authorities is not impaired by the case of the Philanthropic Society, in 5 Binn. 486, because no question of the inherent power to disfranchise was involved in it. The charter authorized the expulsion of any member concerned in scandalous or improper proceedings, which might injure the reputation of the society. The case of Commonwealth *ex rel.* Fischer *v.* The Ger-

man Society, 3 Harris 251, is also important in this connection. In the case of Fuller *v*. The Plainfield School, 6 Conn. 532, it was held that neither disrespectful and contemptuous language towards his associates in the board of trustees, nor neglect of official duty in not acting on committees, would justify the expulsion of a trustee.

These cases establish the proposition, that mere offences against decorum, personal offences of one member against another, so long as they do not tend to the subversion of the government of the corporation and the management of its affairs, do not justify disfranchisement on the ground of being against the duty of the corporator. This court is asked to extend this class in the case of a corporation for social purposes, so as to take in a personal altercation between two members, occurring in the bar-room, and not in the slightest degree interfering with the government of the corporation, or the due management of its affairs.

Failing to show that the club possessed the inherent power to disfranchise Mr. Evans, it is sought to derive the power from the 65th, 66th, and 67th by-laws, relating to conduct disorderly and injurious to the interest of the club. But it is clear that the power of disfranchisement, under a by-law, cannot be more extensive than the inherent power. If franchises depended upon by-laws, their tenure would be infinitely more insecure than the law has declared them to be. But this pretension is at once destroyed by Binns's Case, 2 Binn. 441, and The People *v*. The Medical Society, 24 Barb. 570.

In the case of the Massachusetts Medical Society, 12 Cush. 402, where the court refused to entertain a petition for *mandamus*, the charter gave full power to expel, and the application for a *mandamus* appears to have been a novelty in that state.

The recent decisions of this court show the care with which it guards the rights of members of a corporation against what Chief Justice Tilghman calls " the uncertain will of a majority of the members." See The Butchers' Beneficial Association, 11 Casey 151 ; The Butchers' Beneficial Association, 2 Wright 298 ; and The Beneficial Association, &c., Id. 299.

It is argued, on the other side, that the decision of the meeting which expelled Mr. Evans was the decision of a tribunal of his own choosing, and that the merits of his expulsion cannot be re-examined here. And for this, certain English cases, under Acts of Parliament relating to friendly societies which are not corporate bodies, or governed by the law of corporations, are cited. The acts declare that when the rules of any such society provide for a reference to arbitrators, their decision shall be final; and the cases merely decide that where the arbitrators had jurisdiction, the reasonableness of their decision cannot be inquired into by the courts, and have therefore no bearing on the question now before

[Evans v. Philadelphia Club.]

the court. The cases of The Black and White Smiths v. Vandyke, 2 Wh. 309, Commonwealth v. The Pike Beneficial Society, 8 W. & S. 247, and Toram v. The Howard Association, 4 Barr 519, are disposed of by The Commonwealth ex rel. Fischer v. The German Society, 3 Harris 251.

IV. The proceedings were irregular.

1. The notice of the meeting to be held on the 1st day of June 1863, should have been served on the members in person.

The return states that it was duly posted on the notice-board of the club for the period required by the by-laws, and that a copy of the printed notice was sent, as far as was practicable, to each member. Posting on the notice-board was not sufficient notice. Personal notice to all the members was necessary. The return is defective in not stating to whom or when the printed notice was sent. The statement, " as far as was practicable," is vague and uncertain. It ought to have stated the facts, so that the court could judge. See Kynaston v. The Mayor of Shrewsbury, 2 Str. 1051.

2. There was no proper examination made or proofs given at the meeting held June 1st 1863.

The evidence laid before the meeting consisted partly of ex parte statements or letters. Even supposing that there was no authority to administer an oath, at least the witnesses ought to have been produced, and opportunity for cross-examination allowed.

3. There was no conviction had at the meeting held June 1st 1863, of any offence committed or act done by the relator by reason of which he was expelled.

The preamble recites that Mr. Evans had been guilty of disorderly conduct; but the resolution does not find him guilty, and the preamble is no part of the resolution.

Proceedings to disfranchise must be strictly construed; for a removal being an act of an odious nature, all clauses concerning it must receive a strict interpretation: Rex v. Sutton, 10 Mod. 76.

The judgment of the learned judge before whom the case was argued at Nisi Prius, was affirmed by an equal division of the court in banc.