135      301
26 SC ⁷423
26 SC ⁷424

135      301
215      ⁸630
135      301
32 SC ¹520

## COMMONWEALTH, EX REL., v. UNION LEAGUE OF PHILA.

APPEAL BY DEFENDANT FROM THE COURT OF COMMON PLEAS NO. 3 OF PHILADELPHIA COUNTY.

Argued April 7, 1890—Decided May 26, 1890.
[To be reported.]

1. While an incorporated club, organized for patriotic and social purposes, and owning property, has not a common-law power to expel a member for a minor offence, it may exercise the power of expulsion, even for such an offence, when expressly conferred upon it by its charter: Evans v. Philadelphia Club, 50 Pa. 107, distinguished.

2. A provision, in an act of assembly incorporating such a club, which confers upon it the power of expulsion and the right to regulate by its by-laws the causes of expulsion and the manner of effecting the same, is not in conflict with the constitution of this state or that of the United States, nor can its wisdom or policy be questioned by the courts.

3. Under such a provision, a by-law delegating to a majority of the board of directors the power to suspend members "for acts or conduct which they may deem disorderly, or injurious to the interests or hostile to the objects of the" club, giving a suspended member the right of appeal to the society, and enacting that, unless the sentence be reversed on appeal, he shall forfeit his membership, is valid.

4. It is not necessary that such a by-law should in advance designate and

define the various and specific acts which will be deemed disorderly or injurious to the interests of the society: what is orderly, and what is disorderly and injurious conduct, must necessarily be left to the determination of some appropriate tribunal, and this may legally be done.

5. When a member of a club, composed of gentlemen associated together for patriotic and social purposes, has been guilty of rude and ungentlemanly conduct in the club house, in that, without cause or provocation, he charged upon a fellow member, to his face, that he was acting like a blackguard, his conduct is a sufficient cause of expulsion under such a by-law.

6. It is not essential to the validity of a conviction upon such a charge that there be a finding, in totidem verbis, that the member's conduct is deemed by the board disorderly or injurious to the club's interests, especially if the sentence of the board declare him guilty of a violation of the particular by-law: it is not expected that such proceedings will be expressed with absolute technical accuracy.

7. If the proceedings in such a case are regular, in accordance with the by-laws upon the subject, and conducted in good faith; if the accused has been accorded a full and fair hearing and a proper finding and judgment have been entered upon the facts, and the whole proceeding is stated with substantial accuracy in the record made thereof, that is sufficient.

8. But when the power of expulsion has been exercised in good faith, and in a reasonable, proper and legal manner, its exercise cannot be questioned collaterally: the courts may judge of the cause of the expulsion and the form of the proceedings, to see whether the corporate tribunal has acted within its jurisdiction and in the line of order, but cannot review the case on its merits.

9. Evans v. Philadelphia Club, 50 Pa. 107; Butchers' Benef. Ass'n, 35 Pa. 151, and 38 Pa. 298; Beneficial Ass'n, 38 Pa. 299; Society v. Commonwealth, 52 Pa. 125; Franklin Benef. Ass'n v. Commonwealth, 10 Pa. 357; Pitcher v. Board of Trade, 20 Ill. App. 319, considered.

Before PAXSON, C. J., STERRETT, CLARK, WILLIAMS and MITCHELL, JJ.

No. 203 January Term 1890, Sup. Ct.; court below, No. 657 March Term 1883, C. P. No. 3.

On May 28, 1883, Arthur Burt presented a petition in the court below for a writ of mandamus, directed to the Union League of Philadelphia, commanding it to restore the petitioner, or show cause why he should not be restored, to the rights and privileges of membership therein, from which, as his petition averred, he had been irregularly and unlawfully expelled. Upon the filing of the petition, the court awarded a writ of

alternative mandamus, framed in accordance with the prayer of the petitioner.

On June 23, 1883, the defendant filed its return to the writ, setting forth its charter, by-laws, rules and regulations, in substance as follows:

The defendant was incorporated by the act of March 30, 1864, P. L. 197, the preamble of which recites the purpose of the organization to be the "fostering and promoting the love of Republican Government, aiding in the preservation of the Union of the United States, and extending aid and relief to the soldiers and sailors of the army and navy thereof." Certain provisions of the act are as follows:

"Sec. 3. That the duties and rights of the members of the said corporation, the powers and functions of the officers thereof, . . . . . the mode of electing or admitting members, the terms of their admission, and the causes which justify their expulsion, and the manner of effecting the same, . . . . . shall be regulated by the by-laws and ordinances of said corporation, which they are empowered to make and alter, in the manner which may be therein mentioned: Provided, that the said by-laws and ordinances shall not be repugnant to or inconsistent with the constitution and laws of the United States, or of this commonwealth."

In pursuance of the powers thus conferred upon it, the defendant corporation, on January 6, 1865, adopted by-laws embracing the following provisions:

### ARTICLE I.

Sec. 5. . . . . When a person shall cease to be a member from any cause, all the interest he may have in the property of the league, by reason of his membership, shall be vested in the corporation.

### ARTICLE II.

Sec. 5. A majority of the board shall have power to suspend members for a wilful infraction of the rules of the house, or of any by-law of the league, or for acts or conduct which they may deem disorderly, or injurious to the interests or hostile to the objects of the league, but the offender may appeal from their sentence of suspension, as hereinafter provided; but prior to the suspension of a member he shall be entitled to notice and a hearing before the board, or before a committee of the same, as he may elect.

### ARTICLE IV.

Sec. 1. A member suspended from the league by sentence of the board of directors, may appeal therefrom within thirty days after notice thereof posted on the notice board, by filing with the secretary a written notice of his appeal, and the reasons therefor. In case of no appeal within the time limited, he shall then cease to be a member of the league.

Sec. 2. All appeals shall be tried in a meeting of the league, to be called for the purpose by the board of directors, within forty days after notice of the appeal shall be filed with the secretary.

Sec. 3. The president, or one of the vice-presidents, shall preside at such meetings, and the cause of suspension shall be reported in writing by the board of directors, with a statement of facts on which their sentence was founded, a copy of which shall be furnished to the appellant on his application to be made to the secretary at least ten days before the meeting. The appellant shall then present his defence in writing, to which one member of the board may reply orally. The appellant, or any one member on his behalf, may then rejoin, and a director may a second time speak in support of the charge, and no further discussion shall be allowed. The presiding officer shall then put the question, " Shall the sentence of the board of managers in this case be affirmed? " If a majority of the meeting shall vote in the affirmative, the sentence shall stand as the final judgment of the league, and the appellant shall thereupon forfeit all the rights and privileges of membership. If less than a majority of the meeting vote in the affirmative, then the sentence of the board shall be reversed, and the appellant shall thereupon be restored to membership.

—The return further set forth that in May, 1870, the relator was elected a member of the Union League, and signed the membership book containing a copy of the charter and by-laws, thereby binding himself to the observance of the provisions thereof; that, " although the purposes for which the corporation defendant was originally created were correctly set forth in the preamble to its said charter, yet the purposes of social intercourse entered as an element into its usefulness, and, as the causes which led to its creation ceased to exist within little more than a year thereafter, the element of social

intercourse increased; and, although its members are, to a large extent, composed of persons of a certain political faith, as is the case with similar institutions in other cities of the world, yet a chief purpose of the institution is, and long has been, the promotion of social intercourse between the members themselves, and between the latter and the guests of the corporation, and to this end there was and is required the adoption of, and strict compliance with, certain rules of internal discipline regulating the intercourse within its walls."

That in 1881, after a hearing and proceedings under article II., § 5, of the by-laws, the relator was regularly suspended from membership for disorderly conduct in the league house, but upon his express request, and upon giving assurance of future good conduct, he was reinstated; that on December 30, 1882, William E. Littleton, a fellow member, preferred against the relator a charge of conduct unbecoming a gentleman, in applying to him, Littleton, in the restaurant of the league, grossly insulting language; that the relator, being duly notified, elected to defend against these charges and to prove counter charges made by him against Littleton, before a committee of the board of directors, in accordance with article II., § 5, of the by-laws; that, accordingly, meetings of the committee were held, the parties heard, and witnesses examined, and on February 13, 1883, at a meeting of the board, the committee reported finding the following facts:

"1. That on December 9, 1882, Arthur Burt, in the restaurant of the league, was guilty of rude and ungentlemanly conduct and told a fellow member, William E. Littleton, that he was acting like a blackguard.

"2. That the offence was without provocation on the part of Mr. Littleton.

"3. That Mr. Littleton was not at the time under the influence of liquor."

That the committee also submitted the following resolution which was unanimously adopted by the board:

"Resolved, That Arthur Burt has been guilty of a violation of article II., § 5, of the by-laws of the Union League, and that he be and is hereby suspended from this date from his privileges as a member."

That the relator having appealed from this decision, a meet-

ing of the league was duly called and held on April 3, 1883, at which, after proceedings had in the manner prescribed by article IV., § 3, of the by-laws, a majority of the members present voted to affirm the sentence of the board of managers.

The various proceedings set out in the return are stated with more fulness in the opinion of the Supreme Court, infra.

On September 29, 1884, the relator filed a plea traversing the return. On November 14, 1889, having, by leave of the court, withdrawn his plea, he filed a demurrer to the return, assigning, inter alia, as grounds of demurrer, in substance, that the return was evasive and not responsive to the writ; that the findings of fact made by the committee showed that the relator was not convicted of any offence against the corporation, but at most of an offence against a fellow member; that the return did not show any power given by the corporate charter warranting the expulsion of a member for the offence of which the relator was charged; that the provisions in articles II. and IV. of the by-laws, for the suspension and expulsion of members for acts which the board might deem disorderly or injurious to the interests or hostile to the objects of the league, were repugnant to and in violation of the constitution and laws of this commonwealth; and that the return disclosed no legal ground for the expulsion of the relator.

After argument the court, FINLETTER, P. J., on December 30, 1889, entered judgment for the plaintiff upon the demurrer, filing the following opinion:

The Union League was incorporated for the purpose of fostering and promoting the love of republican government, aiding in the preservation of the Union of the United States, and extending aid and relief to the soldiers and sailors thereof. The return avers that the objects of the league have passed away, and that it has become a club for social purposes. However this may be, its corporate character and the rights of the members remain the same, and can only be changed by an amendment to the charter. If the social elements enter into its business transactions, it is only an incident which confers no additional powers upon the corporation, and can in no degree interfere with the rights of the members. The business proper of the league seldom convokes a majority of the members,

Opinion of Court below.

and those who meet there for pleasure may not change its character and purposes. It is important to keep this in view, in considering the charge and the evidence upon which the relator was disfranchised. Language which might disturb the harmony of a meeting, or interfere with its business, and therefore be an offence against the corporation itself, may have a different aspect when it occurs in the drinking place between two members. It is then an offence against an individual, in which the corporation cannot be involved, and can have no interest.

It has been contended that we have no right to consider the evidence, or the conclusions of the board or of the meeting of the members. If this be so, generally, the evidence having been made a part of the return, we must regard it as complete and for certain purposes to be considered. It shows that the relator's offence was in quietly saying to a member with whom he was conversing in the drinking-room: " I have behaved like a gentleman, and you like a blackguard." He was tried for saying this and not for calumniating a member, and was disfranchised.

Section 5 of the by-laws provides that, " A majority of the board shall have power to suspend members for acts or conduct which they may deem disorderly, or injurious to the interests or hostile to the objects of the league." It is claimed that this section gives the board unlimited authority to declare what shall be " disorderly." Such an interpretation would confer arbitrary and unreasonable power, alike offensive to justice and judicial consideration. " Which they may deem disorderly." means, which they shall adjudge to be disorderly. The power conferred implies that the subject of their action shall be in spirit and substance disorderly, shall be directed against the corporation, and injurious to it. It does not give them the right capriciously to say that any conduct, however trivial, may be deemed by them disorderly.

Disorder is necessarily something which disturbs the quiet or harmony of the occasion. The order of a legislative body, or of a court, could not be said to be interfered with by a remark heard only by the person to whom it was addressed, however insulting it may have been to him. No one else was disturbed by the remark made by the relator. It could not therefore be considered disorderly. Certainly it could not be

so, as against the league, nor injurious to it or its objects. This conduct in no way interfered with its rights, or authority, or with the transaction of business, nor could it affect its reputation. In considering the meaning to be given to "disorderly" in the section, it should not be overlooked that it is placed in juxtaposition with acts and conduct injurious to the interests or hostile to the objects of the league, which were the preservation of republican government and the Union. We conclude, therefore, that the language complained of was not disorderly, within the meaning of the by-law, and was not against the corporation or injurious to it or its purposes.

The principles which rule this case were settled in Evans v. Phila. Club, 50 Pa. 107. The facts were similar, except that the disorder complained of was greater, and the club was organized for social purposes. Chief Justice WOODWARD said: "I look upon the occurrence as disorderly and injurious to the club, within the meaning of the sixty-fifth by-law, but as one of those minor offences for which a majority have no power under the by-laws to disfranchise a member. The relator's offence was not directed against the society, but against a fellow member, as in Earl's Case and Binn's Case. The law affords no precedent for punishing an offence between fellow members by disfranchisement. I am unwilling to make so bad a precedent in this case."

It is contended that the right of expulsion is given to the defendants by the act of incorporation. Section 3 of the charter provides that, "the causes which justify the expulsion of members, and the manner of effecting the same, shall be regulated by the by-laws and ordinances of said corporation: Provided, That they are not repugnant to or inconsistent with the constitution of the United States and this state." It may be conceded that this section confers the right to make such by-laws. But has it been exercised? There is nothing in the by-laws defining the acts for which a member may be expelled. Offences for which he may be suspended are set out fully, but not one for which he may be expelled. The league have not acted upon the power given by the charter, and have not defined the offences punishable by expulsion, and the manner of trial. They cannot, therefore, expel a member, except for violation of the laws of the state, or acts against the organization prejudicial to its welfare.

Opinion of Court below.

It is contended, however, that the by-laws provide that if a suspended member does not appeal within thirty days he ceases to be a member; and if he does appeal, and the finding of the board is sustained, he is likewise expelled; and this is said to be providing for expulsion and exercising the right given by the charter. This view is manifestly in conflict with every sense of justice, and with all proceedings by which the rights of person and property are determined.

A proceeding by a corporation by which the rights of a member are jeoparded has all the consequences of a suit in law or equity. There is no appeal from its judgment, if regular and not contrary to the laws of the state. It should, therefore, conform in substance, if not in manner, to judicial proceedings. In a court of law, where there is no appeal the judgment is fixed and cannot be enlarged. If there is an appeal, the question for decision is whether the proceeding is according to law, and it is affirmed or reversed; but there can be no enlargement of the judgment.

Under the by-law in question, all the solemnities of a trial are had, ending in suspension. If no appeal is taken, the sentence expands to expulsion. If there is an appeal, the question for decision is not the guilt or innocence of the appellant, or the regularity of the proceedings, but "shall the sentence of the board be sustained?" If this is affirmed, expulsion follows, and the property of the accused is confiscated. Is such a proceeding reasonable? Is it depriving a member of his rights of person and property by due course of law? Surely it is "repugnant to or inconsistent with the constitution of the United States and of this state."

The extraordinary and unreasonable character of this by-law is more startling when it is considered that by article II., § 4, of the by-laws, it is provided, that "the board of directors shall make all rules for the management and regulation of the house and the maintenance of good order therein, and provide and enforce penalties for their infraction." The board not only makes such regulations as it may deem proper, but fixes the penalty, tries the offender, and passes sentence upon him. There is, therefore, no limit to the unforeseen and unexpected chances by which membership may be lost.

It is the spirit of all laws that penalties and punishments shall

follow the violation of fixed and known laws only, and shall not be increased after judgment. No corporation having property, in which the members have individual rights, can disfranchise a member unless the power is given by the charter. If the charter authorizes by-laws for expulsion, the right must be exercised; otherwise, it does not exist. By-laws, to be operative, must set out at length ·the conduct which is punishable by expulsion.

The by-laws under which the relator was disfranchised violate all of these principles, and we are compelled to disregard them and adjudge that he was not lawfully expelled.

Judgment for the plaintiff upon the demurrer.

Thereupon the defendant took this appeal, specifying, inter alia, that the court erred:

1. In entering judgment for the plaintiff on the demurrer.

2. In not entering judgment thereon for the defendant.

*Mr. A. T. Freedley* and *Mr. Joseph B. Townsend*, for the appellant:

1. The defendant's by-laws are valid. Its charter gives it the widest latitude for the enactment of by-laws declaring the causes for expulsion and the machinery for effecting the same. There is no provision in these by-laws for temporary suspension, and the final action was not an "enlargement of the judgment" pronounced by the board of directors. The action of the board has precisely the effect of a judgment nisi. By whatever name it be called, whether suspension or expulsion, the result is that the person ceases to be a member, as the suspension is an indefinite one; and the court below has not pointed out any particular in which the constitution of the United States or that of this state has been infringed.

2. The by-laws are not "extraordinary and unreasonable," nor is it requisite that they should "set out at length the conduct which is punishable by expulsion." From the nature of things it is impossible to define beforehand every act which might or might not be disorderly. The provisions as to causes of expulsion are practically the same that prevail in English clubs and have frequently been sustained by judicial decision in that country: Leach's Club Cases, 16, 61 ; Wertheimer on

Clubs, 114; Dawkins v. Autrobus, L. R. 17 Ch. Div. 616; Lambert v. Addison, 46 L. T., N. S., 23; Hopkinson v. Exeter, 5 Eq. Cas. 63; Gardner v. Freemantle, 19 Week. Rep. 256; Lyttleton v. Blackburn, 3 L. T., N. S., 642; Harrison v. Abergavenny, 3 L. T. 625. And they are substantially indentical with the by-laws of clubs in the principal cities of this country.

3. It has been expressly decided, under similar charter powers, that the board of directors may be invested with authority to determine what is cause for expulsion: Pitcher v. Board of Trade, 20 Ill. App. 319. The power of expulsion may be delegated either to the board of directors or to a select number of the members: Wilcock on Corporations, 634; Hussey v. Gallagher, 61 Ga. 86; People v. Commercial Ass'n, 18 Abb. Pr. 271; White v. Brunnell, 2 Daly 329; People v. Board of Trade, 45 Ill. 112; Green v. African M. E. Soc., 1 S. & R. 254. The express charter authority to expel has in this case been duly and validly carried out, and the court was in error in saying that the principles applicable here were settled in Evans v. Phila. Club, 50 Pa. 107. The facts are dissimilar, there having been in the case cited no charter power of expulsion.

4. The board of directors, and subsequently the corporation itself, having adjudged the relator to be guilty of such disorderly conduct as warranted expulsion under the by-laws, the court will not inquire into the merits of their proceeding, the only restrictions upon the exercise of the power of expulsion being that it must have been regularly exercised, in accordance with the code of procedure provided, and that its exercise must be bona fide: Harrison v. Abergavenny, 3 L. T. 625; Black etc. Soc. v. Vandyke, 2 Wh. 309; Society v. Commonwealth, 52 Pa. 131; Commonwealth v. Pike Benef. Soc., 8 W. & S. 250; Toram v. Howard Ass'n, 4 Pa. 519; Moxey's App., 9 W. N. 441; Sperry's App., 116 Pa. 391; Dawkins v. Autrobus, L. R. 17 Ch. Div. 616; Hopkinson v. Exeter, L. R. 5 Eq. Cas. 63; Hurst v. Produce Exchange, 1 Cent. R. 264; Lambert v. Addison, 46 L. T., N. S., 23.

5. The relator is estopped from disputing the validity of the by-laws. He himself invoked these laws to prefer unwarranted charges against a fellow member. By becoming a member he rendered them binding upon him: Leach's Club Cases, 45, 46;

Arguments.

Black etc. Soc. v. Vandyke, 2 Wh. 312; Lyttleton v. Blackburn, 33 L. T., N. S., 642; Pitcher v. Board of Trade, 20 Ill. App. 319; Society v. Commonwealth, 52 Pa. 131; Moxey's App., 9 W. N. 441; Hopkinson v. Exeter, L. R. 5 Eq. Cas. 68. And he is presumed to have knowledge of them: Wertheimer on Clubs, 10. If this court should determine against the defendant on all the questions already argued, then we submit that it had an inherent right to expel the relator upon the facts and for the causes set forth, habitual disorder clearly being prejudicial to the welfare of the organization: Leach's Club Cases, 47. Evans v. Phila. Club, 50 Pa. 107, if correctly decided, does not apply; indeed, the opinion of Judge ALLISON in that case recognizes our position.

*Mr. John G. Johnson* (with him *Mr. Bernard Gilpin*), for the appellee:

1. There was no trial by the body of the league. The question put to it was not, shall the member be expelled? but, shall the sentence of the board of managers in this case be affirmed? The question was really whether or not the board should be condemned for its action. The mode of proceeding was as though the case was between the board of directors and Burt, and was such as has been held wrong, even in England: Labouchere v. Earl of Wharncliffe, L. R. 13 Ch. Div. 354. The return to the mandamus is not clear and unequivocal enough in the attempt to make it appear that the relator signed the by-laws. The allegation of facts in such a return must be free from evasiveness and argumentativeness, and have great certainty and clearness: Commonwealth v. Pittsburgh, 34 Pa. 522; Commonwealth v. Allegheny, 37 Pa. 277; Prospect Brewing Co.'s Pet., 127 Pa. 523.

2. The committee did not find the relator guilty of disorderly conduct, nor that his conduct was such as warranted expulsion. They simply found that, without provocation, he told Littleton " he was acting like a blackguard," and submitted a resolution that he had been guilty of violating article II., § 5, of the by-laws and should be suspended. The board of directors adopted this resolution. It was defective in failing to state of what the relator had been guilty. If it was intended to say that he had violated some of the provisions, infringement of which was to

be visited with suspension, it failed to define which of the several provisions of that kind had been violated. The corpo- ration did not adjudicate him guilty of disorderly conduct, but simply voted, without hearing witnesses, to sustain the sentence of the board of directors. Nor does even the return state that he was guilty of disorderly conduct.

3. A member is not bound by by-laws which are not legal. We object to these by-laws, not merely because there is no averment that the relator had read them, but upon the higher ground that they are not justified by the charter. To say that because he sought to retain his membership by all the means of redress provided within the corporation, he is estopped from asserting its lack of power to expel him, hardly merits notice: Sperry's App., 116 Pa. 399. The association had no inherent power to expel him: Evans v. Phila. Club, 50 Pa. 117. It is sought, however, to piece out the insufficiency of the charge against the relator by saying that he had been guilty of repeated disorders. But there was no such charge made against him to the board of directors, and of course there could have been and was no conviction upon such a charge.

4. The English cases have no application. None of the English clubs are incorporated. As to the proprietary clubs, so called because they have no property, that fact was held in Baird v. Wells, reported in the London Times early in March, 1890, a reason for non-interference by the courts. The clubs owning property are governed by articles of association, signed by the members. The fullest effect is given to them by the English courts, and they are similar to our charters of incorpo- ration. And we admit that if there can be found in our char- ter a right to do what was done in this case, the relator is bound to abide by it. In Pitcher v. Board of Trade, 20 Ill. App. 319, and Society v. Commonwealth, 52 Pa. 131, the charters authorized the action taken. The charter of the Union League provides that its by-laws must not be incon- sistent with the laws of this commonwealth; and, under the settled law, an expulsion from a moneyed corporation, for such conduct as was charged against the relator, is illegal in the absence of express authority in the charter: Com- monwealth v. St. Patrick's Ass'n, 2 Binn. 447; People v. Medical Soc., 24 Barb. 573; Butchers' Ben. Ass'n, 35 Pa.

151; Beneficial Ass'n, 38 Pa. 298; Evans v. Phila. Club, 50 Pa. 117.

5. The by-laws do not define such an offence as that of which the relator was accused, as constituting a cause for expulsion. Disorderly conduct means more than quietly telling a member that he is a blackguard. To justify the expulsion it will be necessary for this court to find, what the league did not, that the conduct of the relator amounted to disorderly conduct or was injurious or hostile to the corporation. The offence charged was one against an individual, and not against the corporation. The by-law is illegal, if construed to impose the penalty of expulsion on whatever conduct the directors may deem disorderly, whether it is such in fact or not. A delegation to the directors of the right to define causes for expulsion which the charter requires to be defined in the by-law itself, would not be legal: 2 Waterman on Corp., 554; State v. Chamber of Commerce, 20 Wis. 63. The charter authorized a specification of causes of expulsion. The by-laws are silent on that subject, providing simply for suspension, a widely different thing. It is true they provide that, as a result of the suspension, cessation of membership may ensue, but they should clearly and unequivocally have said that the offence should be cause of expulsion. And the directors had no right to consider the relator's failure to sustain his charge against Littleton, or the fact of his previous suspension.

OPINION, MR. JUSTICE CLARK:

This proceeding in the court below was a mandamus, brought by Arthur Burt, to compel the Union League of Philadelphia to reinstate him to membership in the league, from which he had been expelled. The petition was filed, and the alternative writ issued, on May 28, 1883, and on June 23d thereafter, the defendant's return was filed. The relator thereupon put in a plea traversing the return, but afterwards withdrew the plea, and filed a demurrer; all relevant matters contained in the return must necessarily, therefore, be deemed admitted and accepted as true. By the return it appears that the Union League of Philadelphia was incorporated on March 30, 1864, during the war of the Rebellion, "for the purpose of fostering and promoting the love of Republican Government, aiding in the

preservation of the Union of the United States, and extending aid and relief to the soldiers and sailors of the army and navy thereof." By their charter the incorporators were entitled to perpetual succession, and were enabled to take and hold title to real and personal property, and to dispose of the same, " provided that the clear yearly value or income of all the estate and property of said corporation, including interest on all moneys by them lent, shall not exceed the sum of ten thousand dollars, exclusive of the real estate in the actual occupancy of the corporation." The officers of the league consist of a president, four vice-presidents, and fifteen directors, to be elected annually, who are authorized to choose and appoint from their own number a secretary and a treasurer.

The third section of the charter is as follows :

" 3. That the duties and rights of the members of the said corporation, the powers and functions of the officers thereof, the mode of supplying vacancies in office, the times of meeting of said corporation, or its officers, the number which shall constitute a quorum thereof, respectively, at any such meetings, the mode of electing or admitting members, the terms of their admission, *and the causes which justify their expulsion, and the manner of effecting the same,* and the mode and manner in which the property of said corporation shall be divided and appropriated, in case of a dissolution of said corporation, or winding up of its affairs, shall be regulated by the by-laws and ordinances of said corporation, which they are empowered to make and alter, in the manner which may be therein mentioned; provided, that the said by-laws and ordinances shall not be repugnant to, or inconsistent with, the constitution and laws of the United States or of this commonwealth."

The first section, article I., of the by-laws, afterwards made in pursuance of the charter, provides as follows :

" The members of the Union League of Philadelphia shall support the constitution of the United States, discountenance, by moral and social influences, all disloyalty to the federal government, encourage and maintain respect for its authority, compliance with its laws, and acquiescence in its measures for the enforcement thereof, and for the suppression of insurrection, treason, and rebellion, as duties obligatory upon every American citizen."

By the return, moreover, it appears that "although the pur-poses for which the corporate defendant was originally created were correctly set forth in the preamble to its said charter, yet the purposes of social intercourse entered as an element into its usefulness, and as the causes which led to its creation ceased to exist, within little more than a year thereafter, the element of social intercourse increased; and, although its members are, to a large extent, composed of persons of a certain political faith, as is the case with similar institutions in other cities of the world, yet a chief purpose of the institution is, and long has been, the promotion of social intercourse between the mem-bers themselves, and between the latter and the guests of the corporation, and to this end there was and is required the adoption of, and strict compliance with, certain rules of inter-nal discipline, regulating the intercourse within its walls."

To advance the purposes of the league, and to promote the social relations of its members, the league became the owner of valuable real estate, upon which is erected a club-house which is maintained and governed according to certain rules and regulations, contained in the by-laws promulgated under the third section of the charter.

The second section of the first article, in defining "the duties and rights of the members," provides that the members "shall have free access to the rooms and library of the league, subject to such rules and regulations as may be prescribed from time to time by the board of directors." The first, second, third, and fourth sections of the second article, defining "the powers and functions of the officers," provide that the board of directors shall consist of the president, vice-president, and fifteen directors, elected annually, eight of their number to constitute a quorum; that this board of direction shall have power to appoint executive committees to carry into effect the objects expressed in the charter, and to prescribe their duties; to "exercise a general superintendence of the affairs of the league, with the control and management of its property and effects," "to make all rules for the management and regulation of the house, and the maintenance of good order therein, and to provide and enforce penalties for their infraction."

The fifth section of the same article is as follows:

"A majority of the board shall have power to suspend mem-

bers for a wilful infraction of the rules of the house, or of any by-law of the league, or for acts or conduct which they may deem disorderly, or injurious to the interests or hostile to the objects of the league, but the offender may appeal from the sentence of suspension, as hereinafter provided; but prior to the suspension of a member he shall be entitled to a notice and a hearing before the board, or before a committee of the same, as he may elect."

The fourth article provides for an appeal, and the trial thereof, as follows:

" 1. A member suspended from the league, by sentence of the board of directors, may appeal therefrom within thirty days after notice thereof posted on the notice board, by filing with the secretary a written notice of his appeal, and the reasons therefor; in case of no appeal within the time limited, he shall then cease to be a member of the league.

" 2. All appeals shall be tried in a meeting of the league, to be called for the purpose by the board of directors, within forty days after notice of the appeal shall be filed with the secretary.

" 3. The president, or one of the vice-presidents, shall preside at such meetings, and the cause of suspension shall be reported in writing by the board of directors, with a statement of facts on which their sentence was founded, a copy of which shall be furnished to the appellant, on his application to be made to the secretary at least ten days before the meeting. The appellant shall then present his defence in writing, to which one member of the board may reply orally. The appellant, or any one member in his behalf, may then rejoin, and a director may a second time speak in support of the charge, and no further discussion shall be allowed. The presiding officer shall then put the question, ' Shall the sentence of the board of managers in this case be affirmed?' If a majority of the meeting shall vote in the affirmative, the sentence shall stand as the final judgment of the league, and the appellant shall thereupon forfeit all the rights and privileges of membership. If less than a majority of the meeting vote in the affirmative, then the sentence of the board shall be reversed, and the appellant shall thereupon be restored to membership."

By the fifth section of article I., it is provided that, " when

a person shall cease to be a member, from any cause, all the interest he may have in the property of the league, by reason of his membership, shall be vested in the corporation."

The penalty, in case of conviction of an offence under the fifth section of the by-laws, it will be observed, is, practically, expulsion : the suspension from the privileges of the league is only during the pendency of proceedings, upon conviction by the board, before and after appeal.   If no appeal be taken within the time specified, or if one be taken and not sustained, expulsion follows.   Suspension indicates merely the status of the member after conviction by the board, pending the time for taking and trial of the appeal.   The sentence of the league cannot, therefore, in any proper sense, be said to enlarge the judgment, as intimated by the learned judge of the court below.

We have quoted extensively from the charter, to show that the power of expulsion was expressly conferred upon the corporation by the charter, with the right to regulate the causes which would justify the exercise of that power, and to define the mode or manner of its exercise ; and even more extensively from the by-laws, to exhibit the rules and regulations, which were made in pursuance of the charter for the government of the league and for the trial and expulsion of members offending against them, in order that we may, in the further consideration of the case, see whether or not these by-laws in any way conflict with the charter, or with the constitution or laws, federal or state. .

On May 3, 1870, as we learn from the defendant's return, the relator was elected a member of the league, and on May 7th signed the book of membership, which contained a copy of the charter and by-laws.   On December 30, 1882, a formal charge was preferred against him by Mr. William E. Littleton, a fellow member, to the effect that the relator was guilty of " conduct unbecoming a gentleman and a member of the league," specifying more particularly that, on the Friday preceding, in the restaurant of the league, the relator had used grossly insulting language to the complainant, and that, under the circumstances, the complainant had no recourse but to report the facts to the league.   Whereupon, at a meeting of the board of directors on the 9th January, 1883, the house committee reported the relator for action, under article II., § 5, of the by-laws, and

moved that notice be sent to Mr. Burt in accordance there-
with ; and in the event that Mr. Burt should choose to be tried
by a committee, the president was authorized to appoint a com-
mittee, not exceeding five, to hear the case and report to the
board, which was agreed to.   The relator, having been duly
notified, elected to be heard by a committee, and the president
thereupon appointed Messrs. E. N. Benson, William C. Hous-
ton, Samuel C. Perkins, and Edwin H. Fitler, the four vice-
presidents, to hear the case.   That committee met at the league
on the evenings of January 16th and January 24th, on both
of. which occasions Mr. Burt was present, and witnesses were
examined.   A counter-charge of the use of offensive language
by Mr. Littleton, as a provocation for Mr. Burt's conduct, hav-
ing been filed, and an intimation given that Mr. Littleton was
under the influence of liquor at the time of the interview be-
tween them, witnesses were called and examined upon that
question also.   At a meeting of the board of directors held
on February 13, 1883, the committee reported that they were
satisfied they had seen and heard every one who could throw
any light on the occurrence which led to the report of the
house committee, and that they found the following facts :

" 1.  That on December 9, 1882, Arthur Burt, in the restaurant
of the league, was guilty of rude and ungentlemanly conduct,
and told a fellow member, William E. Littleton, that he was
acting like a blackguard.

" 2.  That the offence was without provocation on the part of
Mr. Littleton.

" 3.  That Mr. Littleton was not at the time under the influ-
ence of liquor."

The committee submitted the following resolution :

" Resolved, that Arthur Burt has been guilty of a violation
of article II., § 5, of the by-laws of the Union League, and
that he be and is hereby suspended, from this date, from the
privileges of a member."

Whereupon, on motion, the report was accepted by the board,
and the resolution adopted.

On March 13, 1883, the relator entered and gave notice of
an appeal, assigning the following reasons in support of it :

" 1.  That the testimony produced, at the hearing in the mat-
ter before the committee, does not show any sufficient cause for
the sentence or suspension imposed by the board.

" 2. That the offence for which said sentence of suspension was imposed was of such a trifling nature that the punishment by suspension is an unnecessarily harsh and severe one."

A special meeting of the league was thereupon called, upon due and proper notice, for trial of this appeal on April 3, 1883, the trial to be conducted under article IV. of the by-laws. There were present at this meeting 279 persons, which was a quorum, the president, George H. Boker, in the chair, and the trial was proceeded with. The statement of the board in writing setting forth the facts as found by the committee, and the action of the board of directors thereon, was first read. In this statement, the board set forth that the counter-charge against Mr. Littleton, having been found to be wholly unwarranted, was deemed an aggravation of the relator's offence; and that the further fact, that the relator had on a previous occasion been suspended for a very gross offence of a similar character, (which is fully set forth in the return,) and had only been reinstated upon promise of amendment and a pledge that there would be no further cause of complaint, was a matter which entered into the consideration of the board in inflicting the sentence of expulsion.

The relator's statement in writing was then read. No witnesses were called; neither of the parties appear to have expressed any desire to that effect; the appeal was submitted upon the facts found by the committee. Mr. Pettit addressed the meeting on behalf of the board; Mr. McVeigh, in behalf of Mr. Burt, and Mr. Perkins closed the discussion. The president then put the question: " Shall the sentence of the board of managers, in this case, be affirmed? " The result of the vote was 146 ayes, and 75 noes; members present, 279. A majority of those present having voted in the affirmative, the president announced that the appeal was not sustained, and that Mr. Arthur Burt ceased to be a member of the Union League.

We give this statement of the relator's arraignment, trial, and conviction from the defendant's return, where the facts, we think, are stated, not argumentatively, inferentially, or evasively, but with fair and reasonable certainty. The cause of the relator's disfranchisement, and the proceedings by which it was effected, are distinctly and clearly set forth. It is true,

the relator does not appear to have been found guilty of "acts or conduct" which by the board were "deemed disorderly," or "injurious to the interests or hostile to the objects of the league," in totidem verbis; he was found guilty of rude and ungentlemanly conduct, in the league-house, in this: that, without cause or provocation, he charged upon a fellow member that he was acting like a blackguard. This was certainly conduct of a disorderly character, especially as it occurred within the club-house, a place devoted to the cultivation of friendly political and social relations between gentlemen, and might well be deemed disorderly by the board of directors; that the board did deem the act disorderly, and injurious to the interests and hostile to the objects of the league, is shown by their formal resolution to that effect. It is not expected that the proceedings of a trial of this character, which are conducted in most cases by persons unlearned in the law, will be expressed with absolute technical accuracy, or will be subjected to the severe scrutiny which is applied, by persons of critical professional skill, in courts of law. If the proceedings are regular, and conducted in good faith; if the accused has been accorded a full and fair hearing, and a proper finding and judgment has been entered upon the facts, and the whole proceeding is stated with substantial accuracy, it is sufficient. The trial seems to have been conducted in an orderly manner, according to the strict letter of the by-laws of the league. The proceedings are in due form, and the relator, for anything that appears, was allowed the benefit of a full and impartial hearing, before a committee of the board, at his own election: it does not appear that he was denied any right or privilege to which he was entitled. There is no allegation, much less evidence, of fraud or unfairness, and we assume that the action of the league was in good faith.

The only question, as we understand the case, is one of power. Was the league duly and legally authorized, by the by-laws, to expel the relator from membership, for the offence charged and of which he was convicted? The case of Evans v. Phila. Club, 50 Pa. 107, bears no analogy, in principle, to the case in hand. In that case there was no express power of expulsion conferred in the charter, and the decision rested wholly upon the ground that the offence was not such as fell

within the inherent powers of the corporation at common law. The common-law power of expulsion, as declared in the opinion of Chief Justice WOODWARD, who tried the case at nisi prius, may be stated thus:

1. The power of disfranchisement must, in general, be conferred by the charter. It is not sustained as an incidental power, excepting, first, when the member has been legally convicted of an infamous offence; or, second, when he has committed some act tending to the destruction or injury of the society.

2. The power to make by-laws is incidental to corporations, but is generally conferred by charter; by-laws, however, which vest in a majority the power of expulsion for minor offences are void, and expulsion under them will not be sustained.

3. In joint-stock companies, or corporations owning property, no power of expulsion can be exercised, unless conferred by statute.

On error to this court, these rulings at nisi prius were affirmed by a divided court. Evans had been convicted of breaking the sixty-fifth article of the by-laws of the club, by having an altercation within the walls of the club-house with Samuel B. Thomas, and by striking him a blow. "I look upon the occurrence," says the Chief Justice, "as disorderly and injurious to the interests of the club, within the meaning of the sixty-fifth by-law, but as one of those 'minor offences,' . . . . . for which a majority have no power, even under the by-laws, to disfranchise a member; and, upon the doctrine of the cases I have referred to, I hold the by-law void, so far as it inflicts this extreme penalty for such an offence. I would be very sorry to say that anything short of a statute could confer on a majority of the members of any corporation power to expel a fellow member for merely disorderly conduct. . . . . It is not a joint-stock company at present, for under its by-laws no pecuniary profits are divisible among the members, but it may become so; and, whether it does or not, the relator has a vested interest in its estate, and cannot be deprived of it by the proceedings that were had against him. On this point the authorities are clear, and without conflict. Nothing but an express power in the charter can authorize a money corporation to throw overboard one of its members. I have shown that the

act of incorporation contained no such power.   On the contrary, it excluded it; for the proviso reads, ' that nothing herein contained shall be so construed as to authorize said Philadelphia Association & Reading-room to do any other act or acts, in their corporate capacity, than are herein expressed.' "   These excerpts, drawn from the opinion of the Chief Justice, show that, while he denied the common-law power of a corporation to disfranchise its members, with the exceptions stated, he conceded that where the power is conferred by the charter, it may be exercised even for minor offences, and in money corporations.

The Union League, although not a proprietary corporation, cannot in any strict sense be considered a joint-stock or moneyed corporation : its objects and purposes, as well as its management, are of a purely patriotic and social, and not of a financial or monetary character.   Although authorized to hold property, real and personal, to a certain limited extent, for the promotion of the objects of the league, it is plainly distinguishable from such corporations as are organized for business and for purposes of gain, and this is fully illustrated in the present conduct of its affairs.   In the by-laws it is provided " that no member shall receive any profit, salary, or emolument from the funds of the league."   Members are admitted, not upon payment of the estimated value of a share or interest in the property of the league, but of a merely nominal sum as an admittance fee, and are charged with the payment of an annual tax of $25 for the support of the league, whilst their franchise and property rights are not inheritable, but continue for life, or during membership only.   But, however this may be, the power of expulsion is expressly conferred by the charter, and the causes which shall justify it, and the manner of effecting the same, are expressly committed to the corporation, to be regulated by the by-laws, which by-laws " the corporation and its officers are empowered to make and alter in the manner therein mentioned."   It is plain, also, that, according to the by-laws made under this provision of the charter, a majority of the board of directors has the power to suspend a member for acts or conduct which they may deem disorderly, or injurious to the interests or hostile to the objects of the league, " and this suspension, unless the member is subsequently restored, is equivalent to an expulsion."

Opinion of the Court.

It is contended, however, that this provision of the charter, and of the by-laws, is illegal and void, inasmuch as the personal franchise and property rights of each individual member is subject to the action of a majority. We cannot see, nor has it been suggested, how this section of the charter can be said to be in conflict with the constitution of the state or of the United States; and, if it is not, it is more difficult to see how that may be said to be unlawful which the law-making power of the state has expressly declared to be lawful. The relator, at the time of his admission to the league, was bound to know the provisions of the charter, and will be held to have assented to its provisions and to the frame of government which was lawfully set up in accordance therewith. By the terms of his admission, the relator voluntarily submitted himself in all matters pertaining to the government of the league to the action of the board, and of the majority; and he could not thereby have been deprived of any constitutional or legal right, for the tribunal was practically one of his own selection. In the case of Butchers' Benef. Ass'n, 35 Pa. 151, and 38 Pa. 298, and Beneficial Ass'n, 38 Pa. 299, applications for charters under the act of 1833 were refused by this court, for the reason that the provisions of their proposed charters gave entirely indefinite powers over its members, and, as this was supposed to be incompatible with the spirit of our institutions, the charters were refused; but if they had been granted, no one can doubt that the powers conferred, if exercised in a reasonable manner and not arbitrarily or capriciously, would have been sustained. Here, however, we have a legislative charter accepted and acted upon: the powers of the corporation have vested, and it only remains for us to inquire whether these powers have been exercised in a proper and legal manner.

The case bears a closer analogy to Society v. Commonwealth, 52 Pa. 125, where the corporation held a charter under the act of 1791, in which the general power of expulsion was conferred, with the right to enact by-laws, and to alter, amend, and repeal the same. The objects of the society were, in case of sickness of a member, to visit and to console him, and to give him advice and assistance; in case of death, to bury him, free of charge; and to assist the families of deceased members, according to the circumstances and available means of the so-

ciety. The relator, Meyer, was convicted of "feigning himself sick without being so," and of "drawing relief after his recovery," which were offences declared by the by-laws. It was held that the society had a clear right, under the charter, to pass sentence of expulsion for violation of the by-laws, and, by reason of the nature of the offence, a like power at the common law. Speaking of the force and effect of the charter, Mr. Justice AGNEW says: "Having the force and effect of law, by the provisions of the act allowing the incorporation, it . . . . . is no longer a subject of judicial inquiry as to the fitness of its objects, conditions, and articles." In Franklin Benef. Ass'n v. Commonwealth, 10 Pa. 357, the society was organized under the act of 1791 for mutual assistance in sickness, etc.; and, in order to provide against extraordinary perils, a by-law prohibited members from enlisting as soldiers in the army, and, notwithstanding the general and manifest impolicy of such a provision, it was said that in a proper case it might be sustained: such an objection, the court said, would go to the legal existence of the association; if the articles were against the public policy, it belonged to the court, in the first instance, to withhold the certificate. And as the legislature, by a direct statute constituting the charter of the Union League, has expressly given to the members themselves the right, through their by-laws, to regulate the causes of expulsion and the manner of effecting the same, we cannot see why the right thus conferred may not be exercised. The wisdom or policy of the provision having been determined by the legislature, it is not now the subject of judicial inquiry.

Nor, in view of the very general and comprehensive powers thus conferred, and of the objects and purposes, conduct and management of the league, can we say that the by-laws, ordained pursuant to the charter, are unreasonable, arbitrary, or oppressive, or that they violate any principle of natural justice. We see nothing unreasonable in a by-law of a club, consisting of gentlemen who are associated for patriotic and social purposes, requiring the observance of a proper decorum and gentlemanly personal intercourse, between the members, whilst within the walls of the club-house: the lack of such regulations would certainly tend to promote such disorder and dissension as would be fatal to the attainment of the objects of

Opinion of the Court.

the association.   Any vilification of a member, or exhibition of personal rancor towards him, or the use of abusive or offensive epithets respecting him, especially in his presence and hearing, within the club-house, is, without doubt, disorderly and injurious to the interests of the club.   Nor is the by-law in question illegal, or in conflict with the charter, in this, that it does not designate and define the various and specific acts which will be deemed disorderly.   To have anticipated in a by-law the various disorderly acts which might or could occur, would have required the exercise of a very fertile imagination; neither the statute nor the common law contains any such ridiculous detail.   What is orderly, and what is disorderly conduct, injurious to the interests and hostile to the objects of the league, must necessarily be determined by some proper tribunal; and the board of directors, to whom the practical management of its affairs is given, constitutes, in the first instance, the tribunal which the members have themselves set up, to have and exercise jurisdiction over such offences. When Mr. Burt became a member of the league, he voluntarily submitted himself to this jurisdiction; he was admitted upon the terms of the charter, with knowledge that he must submit to all such regulations as the by-laws might reasonably provide, and that, for any wilful violation or infraction thereof, he was liable to be disfranchised.

The offence of which he was convicted, it is true, was a minor offence; not such as would have justified his expulsion at the common law, but such as justified the league, acting in good faith, in the exercise of the powers conferred by the charter, in imposing that sentence; and especially as the relator, on a previous occasion, had been suspended for an offence of a similar character, and was reinstated upon his promise of amendment and his pledge that there would be no further cause of complaint.   Nor is it wholly without significance that the counter-charge against Mr. Littleton was wholly groundless, unwarranted, and untrue.   It does not appear that the board of directors, nor the league, in the exercise of their powers, either in the framing of these by-laws or in the trial and conviction of the defendant, acted arbitrarily or oppressively or in any sense unjustly, or that Arthur Burt was disfranchised without cause.

The league in the trial of this cause acted as a judicial tribunal: the offence charged, although a minor offence, was such as brought the relator within the jurisdiction; the trial was conducted in good faith and in due form, and the relator was convicted and sentenced in accordance with the law of the league, which we have said was in conformity with the charter. We may judge of the cause of the expulsion and of the form of the proceedings: Commonwealth v. German Soc., 15 Pa. 251, but we cannot review the case on its merits.

The relator's guilt of the offence charged is res judicata. The courts entertain jurisdiction to keep these tribunals in the line of order, and to correct abuses, but they do not inquire into the merits of what has passed in rem judicatam, in a regular course of proceeding: Commonwealth v. Benef. Soc., 8 W. & S. 247; Toram v. Benef. Association, 4 Pa. 519. In Society v. Vandyke, 2 Wh. 312, Chief Justice Gibson asserted that the by-laws of a private corporation like the present derived their force from assent either actual or constructive, and the party assenting to the charter is consequently bound by everything done in accordance with it; and, when he has been regularly tried and expelled, the sentence of the society, acting in a judicial capacity and within its jurisdiction, is not to be questioned collaterally, whilst unreversed by superior authority. If he have been expelled irregularly, the Chief Justice adds, "he has his remedy by mandamus to restore him, but neither by mandamus nor action can the merits of his expulsion be re-examined." We quote from the opinion of Mr. Justice Agnew, in Society v. Commonwealth, 52 Pa. 125, where the case in 2 Wh. 312, is followed, and the same rule is recognized and approved. No case has been called to our attention in which a different rule is laid down.

We have made no reference to the English cases cited at the argument: the English clubs are not incorporated; they are formed under written articles of agreement, and the rules of law applicable thereto are somewhat different, for there the members are held upon the footing of a personal contract; whereas, in the case of a corporation, as we have already said, the courts will see that the powers conferred, and especially the power of expulsion, are not exercised in an oppressive or arbitrary manner, but in good faith and upon reasonable cause.

We have confined our citations to our own cases, which, however, do not differ in any material respect from the cases elsewhere.   One case has been brought to our attention, Pitcher v. Board of Trade, 20 Ill. App. 319, which appears to bear a very close analogy to the present.   The board of trade was a body corporate, created by a special act of the legislature : it owned a large amount of property; its object was the promotion of trade, and the admission fee was $10,000.   The corporation was authorized to establish such rules, regulations and by-laws for the management of their business and the mode in which it should be transacted, as they might think proper, and had "the right to admit or expel such persons as they may see fit, in a manner to be prescribed by the rules, regulations, and by-laws thereof."   Pitcher was admitted as a member, and paid the price of admission, but was afterwards charged with "fraudulent conduct in a business transaction," an offence declared by the by-laws; he was tried before the board of directors under the by-laws, and the charge being sustained he was expelled.   On a mandamus, it was held that, as the charter conferred a general power of expulsion to be exercised as prescribed by the rules, regulations, and by-laws, that power was such as could be delegated to the board of directors.   "It seems to us," says Judge McAllister, who delivered the opinion, "from a consideration of all the provisions of the act, that its framers intended to leave the whole subject-matter of the expulsion of members to be regulated, both as to method and tribunal, by rules and by-laws of the body, not inconsistent with the principles of natural justice or the laws of the land.   In pursuance of that power, the by-laws, set out in our statement of the case, were adopted, by which appellant on admission formally agreed to be bound.   We are of opinion that such by-laws were authorized by the act, are not inconsistent with any principle of natural justice or the laws of the land, and are valid; that the trial, conviction, and expulsion of appellant were by a tribunal, not only authorized by appellee's charter but by reason of appellant agreeing to be bound by said by-laws."   The case cited presents many points of similarity to the present case.   The corporations, in both cases, owned property of large value; members were admitted on payment of a money consideration; the power of expulsion

was in both instances conferred by charter, and was delegated under the by-laws to the board of direction, not only as to the causes, but as to the manner of its exercise; and in neither case was the particular act or thing charged specifically set forth as an offence in the by-laws, but was, on the trial, so adjudged by the board of directors.

We are of opinion, after a careful examination of the whole case, that the learned court below erred in entering judgment for the plaintiff upon the demurrer.

The judgment is therefore reversed, and judgment is now entered for the defendant.