# Carlin *v.* Ancient Order of Hibernians, Appellant.

*Beneficial associations—Corporations—Constitution and by-laws—Expulsion of members.*

1. Where the charter of a corporation contains no power of expulsion, a member can be expelled only when he has been guilty of some infamous offense, or has done some act tending to the destruction of the society.

2. If the by-laws and constitution of a beneficial association chartered as a corporation of the first class under the laws of Pennsylvania provide that a member may be expelled for divulging the pass word of the order, or for committing "any offense which tends to bring discredit upon it, or injure the order," members may be expelled for par-

ticipating in an illegal meeting at which the pass word is divulged; and if they are given a fair trial, or given an opportunity for a fair trial in the manner provided by the constitution and by-laws, and they refuse to avail themselves of such opportunity, they have no standing to resort to a court of equity to secure their reinstatement to membership.

3. When the power of expulsion has been exercised in good faith, and in a reasonable, proper and legal manner, its exercise cannot be questioned collaterally; the courts may judge of the cause of the expulsion and the form of the proceedings to see whether the corporate tribunal has acted within its jurisdiction and in the line of order, but cannot review the case on its merits.

4. The constitution and by-laws of the grand and supreme lodges of the various orders and societies of The Ancient Order of Hibernians are binding upon the members of the subordinate lodges.

*Appeals—Assignments of error—Equity—Final decree—Exceptions— Act of May 11, 1911, P. L. 279.*

5. The appellate court will not quash an appeal in an equity case because the final decree was not specially assigned as error, where it appears that there were seventeen assignments of error to findings of fact and conclusions of law, that every phase of the case is fully considered in the arguments, and that the case itself was one of great importance on account of the questions involved, and the number of parties interested. In such a case the court will permit the filing of a formal assignment even after argument.

6. Since the Act of May 11, 1911, P. L. 279, the appellate court may consider an appeal in an equity case although no exception was taken to the final decree, if the decree itself appears in the record.

Argued Oct. 24, 1913. Appeal, No. 32, Oct. T., 1912, by defendants, from decree of. C. P. No. 2, Phila. Co., March T., 1911, No. 3,393, on bill in equity in case of James J. Carlin et al. v. Division No. 5 of Philadelphia County, Pennsylvania, of the Ancient Order of Hibernians of America, Patrick McCauley et al. Before RICE, P. J., HENDERSON, MORRISON, ORLADY, HEAD and PORTER, JJ. Reversed.

Bill in equity for an injunction. Before WILTBANK, J. The facts are stated in the opinion of the Superior Court.

*Errors assigned* were (1–17) various findings of fact and conclusions of law, but not to the final decree.

*Frank Rogers Donahue,* with him *Samuel M. Clement, Jr.,* for appellants.—The complainants were properly expelled: Crow v. Capital City Council, 26 Pa. Superior Ct. 411; Com. v. Union League, 135 Pa. 301.

It has been repeatedly decided that the courts will not inquire into what has passed in a regular course of proceeding: Com. v. German Society, 15 Pa. 251; Sperry's Appeal, 116 Pa. 391; Crow v. Capital City Council, 26 Pa. Superior Ct. 410.

*Thomas Raeburn White,* for appellees.—The corporation defendant had no power under its charter to expel the plaintiffs for the acts complained of: Weiss v. Musical Mut. Protective Union, 189 Pa. 446; Evans v. Philadelphia Club, 50 Pa. 107.

The trial and expulsion of the plaintiffs was in violation of the rules of the order, was contrary to law, and is null and void: People ex rel. v. Musical Union, 54 N. Y. (47 Hun) 273.

Plaintiffs were justified in appealing to the courts without further efforts to secure justice within the order: Gill v. Ladies Catholic Benevolent Assn., 36 Pa. Superior Ct. 458.

OPINION BY ORLADY, J., October 13, 1913:

On April 5, 1911, Division No. 5, Ancient Order of Hibernians, expelled from membership in that division, James J. Carlin and sixteen other members. From this order or judgment no appeal was taken as provided by the constitution and by-laws, and the plaintiffs stand as expelled members of the Division. This bill in equity was filed to effect their reinstatement as members, with all the rights and privileges as such.

This Division No. 5, was organized in 1875, by a charter from the Ancient Order of Hibernians of America, through the national officers of the organization, in accordance with the constitution and by-laws of the National Association and on May 19, 1891, by a decree

of the court of common pleas No. 3, of Philadelphia county, became a corporation. Section 2 of its charter providing: "The said corporation is formed for the purpose of raising a fund of money for maintaining its sick or disabled members, for the burial of deceased members of the order, and for its legitimate expenses in accordance with the constitution and by-laws of the national and state organizations of The Ancient Order of Hibernians of America, which are not in conflict with the constitution of the United States or the constitution of Pennsylvania." It is agreed that each member on joining the division takes the following obligation: "I do declare and promise that I will keep inviolate all the secrets of the Ancient Order of Hibernians from all but those whom I know to be members in good standing, except the Roman Catholic clergy, and that I will support the by-laws of this organization to the best of my ability."

The constitution and by-laws provides: Section 5, "The Division officers shall be nominated at the first regular meeting in November, and elected at the first regular meeting in December of each year, and installed at the first regular meeting in January of each year, and shall hold office for the term of one year or until their successors are duly elected and installed." The corporation, at the time the bill was filed had 585 members and had accumulated real and personal property of the value of $18,000. The regular meeting of the corporation was held on November 2, 1910, and in accordance with the by-laws nominations for officers were duly made. At this meeting all of the plaintiffs were present and participated in the action.

On November 27, 1910, a special meeting of the corporation was held pursuant to a call issued by the chairman, and at this meeting the minutes of the previous meeting were approved. A resolution was adopted providing that the meeting in December should be held on the Sunday following the first Wednesday, and at

Temperance Hall, Manayunk, instead of the regular meeting place, because many of the members being working men could not attend on a week day, and because the regular hall was too small to accommodate all the members. Notices of this meeting were mailed to each of the members, under date of December 3, 1910, fixing Sunday, December 11, 1910, in Temperance Hall, Levering street, Manayunk, Philadelphia, as the place of the meeting to elect officers. At this meeting of November 27, all of the plaintiffs were present.

On the first Wednesday of December (7th instant), a meeting of about eighty-six members, including the plaintiffs, was held at the regular meeting place No. 4147 Main street, Manayunk. None of the regular officers were present at this meeting, when James J. Carlin called the meeting to order, and on motion duly put and carried, Charles J. Murray was elected to act as president, F. McMonagle as vice president, and Jos. J. McKernan as recording secretary, pro tempore to conduct the meeting. The minutes of this meeting show that, "After taking up the pass the meeting was opened regularly by prayer. Under new business, it was decided without opposition, to go into the election of officers for the ensuing year, and the ballot resulted in the selection of a president, vice president, and all other officers provided for in the by-laws, and by a unanimous vote the acting secretary was ordered to notify the county president of the election. The meeting adjourned to meet on the first Wednesday in January, 1911.

On Sunday, December 11, 1910, in accordance with the action of the meeting held on November 27, the defendants claiming to represent the entire Division, held a meeting, pursuant to notice and the call signed by the president and secretary, "for the purpose of transacting the regular business, and also for the annual election of officers"—at Temperance Hall, at which meeting 422 members were present, when the officers named as the defendants herein were elected to their

respective offices and were subsequently installed by the National officers of the Ancient Order of Hibernians of America, and these have since acted as the officers of the society to the date of filing this bill in equity. The plaintiffs herein questioned the legality and validity of this election, appealed to county board, which tribunal after due hearing sustained the election of the last named officers.

Article 39, sec. 5, of the constitution provides: "It shall be the duty of the President of each division to suspend from membership any member of his Division upon satisfactory proof that such member has failed or neglected to perform his duties or who has committed any offense which tends to bring discredit upon or injure the order, within ten days after such suspension he shall report the same to the standing committee of his Division with the reasons for such suspension, whereupon the standing committee shall, after notice to such member and investigation affirm or reverse the same." At the regular meeting held on January 4, 1911, written charges were preferred by the trustees against the sixteen named plaintiffs in this bill, in which they were charged with violating art. 38, sec. 9, by "divulging the pass word of the order," and art. 39, sec. 5, "by conducting an illegal meeting and taking part in same on December 7, 1910." These charges were referred by the president to the standing committee, who by sec. 7, of art. 22, "shall try all charges preferred against members, adjust disputes or grievances and perform such other duties as may be assigned thereto."

This committee submitted a report, with their findings of fact, reciting that each of the accused had been given notice of its meetings, but at the time and place mentioned for the hearing, after waiting for two hours, none of the accused and charged members had appeared to refute or affirm the charges, and concluded, as follows: "Your committee have formally affirmed the President's rulings in suspending the named brothers ac-

cording to art 39, sec. 5, and we now request the penalty prescribed by art. 38, sec. 9, for violating said article be carried out and the above named members be expelled." This report with its recommendation was adopted, and each of the plaintiffs was regularly notified that he was expelled from membership of Division No. 5, etc.

Art. 38, sec. 9, of the constitution is as follows: "Any member who shall divulge the password of the order to any person except the duly authorized officers within the Division room shall be tried by the proper tribunal and, if found guilty, expelled, never to be readmitted," and sec. 10, of the same article, "Any officer or member who shall fail or neglect to perform his duties, commit any offense which tends to bring discredit upon or injure the Order, or be injurious to his health, shall be tried by the proper tribunal and if found guilty, fined, suspended or expelled."

It has been deemed important to record the proceeding at this length, to better understand the different contentions of counsel. After a hearing before the court, the learned trial judge held in his opinion "That the plaintiffs had disregarded and repudiated the order of procedure validly established by the body at the meeting of November 27. . . . The result has been a deplorable condition of discomfort weighing upon the settled men of the Division, without any advantage to the dissentients; . . . . the trial of the plaintiffs was a fair one and in accordance with the law of the Order, without violation of the provisions of the national and state constitutions, and after sufficient notice to the parties charged. The standing committee was the established and long recognized tribunal for the consideration of petitions of complaint, the taking of proofs, and the reporting of a sentence to be pronounced and executed. . . . The plaintiffs have not offered an explanation of their neglect to attend the meetings of the standing committee and there offer such defense as they

relied upon. They remained silent after the opportunity had been offered to them at least three times to reconcile themselves to the legal body. . . . I find that the procedure (the annual meeting of December 7, 1910, held on Sunday and not the first Wednesday of that month) to have been according to law, and no equity in respect to it, and its consequences has been invoked and established by way of modification of the results."

While it is true that the standing committee but recommended suspension for violation of art. 38, secs. 5 and 9, in divulging the password and holding the illegal meeting, these plaintiffs are not in position to complain of the more severe sentence,—expulsion—being imposed. It is not pretended that the standing committee would not have had the right to recommend such a sentence as their report of facts was before the Division for consideration. All the facts were not only well known, but these plaintiffs defiantly refused three different times to appear before the standing committee and make their explanation or defense, and did not appeal to the county board in a legal and orderly manner. The Division accepted the report and recommendations of the standing committee, and imposed the penalty the Division thought proper and necessary in order to preserve the Division from further discord— under sec. 10, of the same article, "in bringing discredit upon or injuring the Order."

After a painstaking examination of the facts and law relating to them the learned trial judge concluded that "(1st), the proceedings at the meetings of November 2, and 27, were regular and legal. 2d. That the election of officers of December 10, was regular and legal. 3d. That the constitution and by-laws of the grand and supreme lodges of the various orders or societies of the Ancient Order of Hibernians of America are binding upon the members of the subordinate lodges. 4th. That the charter of Division No. 5, incorporates the constitution and by-laws of the original order, and by the

terms of admission to Division No. 5, each member submitted himself to the rule and operation of these codes. 5th. That the corporation defendant had no power under its charter to expel the plaintiffs for the acts complained of, and, 6th, The trial and expulsion of the plaintiffs was in violation of the rules of the Order, was contrary to law, and is null and void," and entered a decree reinstating the plaintiffs as members in the corporation, with all the rights and privileges as such. From this decree the defendants appeal. The conclusions of law by the learned trial judge are largely based on Weiss v. Musical Protective Association, 189 Pa. 446.

The reason for the conclusion reached in the last-cited case, is found in the statement by Kennedy, J., which was affirmed by the Supreme Court, viz: "It seems clear that provisions of the constitution and by-laws of the respondent corporation which were intended for the protection of members against illegal expulsion, and to secure to them a fair and impartial trial were violated in both the letter and spirit on the trial of these plaintiffs, if such proceedings can be called a trial." In the case of Division No. 5, the charges were properly prepared and presented to the proper body for hearing and trial, the report was made after the plaintiffs—three times—ignored the tribunal designated · by their own by-laws, and they acquiesced in the finding and decision by refusing to appeal from that decision of the standing committee to the county board, as lawfully provided, so that justice be done to them. The constitution and by-laws were technically followed, the fairness of the trial is evidenced by the action of the standing committee in reporting for suspension but sixteen of the eighty-six members who participated in the seditious meeting held on December 7, 1910, at which meeting the constitution and by-laws were violated both in letter and spirit. The writ of mandamus was issued in Weiss v. Mut. Prot. Union, 189 Pa. 446, infra, solely

and only for the reason that the fundamental law of the union had been entirely ignored in the expulsion of the complainants. The effect of that decision is that where the charter of a corporation contains no power of expulsion, a member can be expelled only when he has been guilty of some infamous offense, or has done some act tending to the destruction of the society, but where the proceedings are regular and a fair trial had the offense of "being guilty of some act tending to the destruction of the society" is just as flagrant, and perilous to the life of the society as being found guilty of an infamous offense.

It is conceded that where one method of punishment is provided for the violation of the constitution and by-laws, all other methods are excluded, but it is just as clear that the constitution and by-laws of Division No. 5 contain ample provisions for the expulsion of members for designated offenses, such as "an offense which tends to being discredit or injure the Order" is one, as well as "exposing the password." In Commonwealth v. St. Patrick's Benevolent Society, 2 Binney, 441, TILGHMAN, C. J., states the law to be, "Every incorporation possesses inherently, the power of expulsion in certain cases, because such power is necessary to the good order and government of corporate bodies. There is a tacit condition annexed to the franchise of a member, which, if he breaks, he may be disfranchised," and concludes "On mature reflection it appears to me, that without an express power in the charter, no man can be disfranchised, unless he has been guilty of some offense, which either affects the interest of good government of the corporation, or is indictable by the law of the land." It follows, that the exception mentioned, is just as effective a cause for expulsion if legally determined, and as if it had been specially granted in the charter. As held in Commonwealth v. Philanthropic Society, 5 Binney, 486, in which the same learned judge states (in sustaining an expulsion of a member for being con-

cerned in "scandalous and improper proceedings"): "Did it tend to injure the reputation of the Society? No man can doubt it. A Society that would not be injured by such a proceeding as this, on the part of one of its members, must be a society without reputation." In Society for the Visitation of the Sick v. Commonwealth, 52 Pa. 133, it was held in a case where a member was convicted by the society of "feigning himself sick without being so"—AGNEW, J., says: "It is obvious therefore that to feign sickness or deceitfully draw relief after recovery are offenses not only fraudulent, but subversive of the fundamental objects of the association. . . . The position is too clear for argument, and brings the offense directly within the second branch of the admitted power of expulsion— 'An act against the society which tends to its destruction and injury'—'an offense against his duty as a corporator,'" citing the two last mentioned cases and adding—"These with the authorities before cited establish the character of the offense, bringing it within the power of expulsion, had the charter not expressly provided for it."

In Evans v. Philadelphia Club, 50 Pa. 107, it was again declared, "The power of disfranchisement which does destroy the members' franchise, must in general be conferred by statute, and is never sustained as an incidental power except on conviction of a member in a court of justice, for an infamous offense, and for the commission of some act against the society which tends to its destruction or injury." This case was considered in and distinguished from Commonwealth v. Union League, 135 Pa. 301, but the principle above announced was not in any manner disturbed. In the Union League case, "The power of expulsion is expressly conferred by the charter and the causes which justify it, and the manner of effecting the same, are expressly committed to the corporation, to be regulated by the by-laws," etc. In noting the special offense in that case, Mr. Justice CLARK says: "The lack of such regulation would cer-

tainly tend to promote disorder and dissension as would be fatal to the attainment of the objects of the association." And further, as stated in the syllabus, "When the power of expulsion has been exercised in good faith, and in a reasonable, proper and legal manner, its exercise cannot be questioned collaterally; the courts may judge of the cause of the expulsion and the form of the proceedings, to see whether the corporate tribunal has acted within its jurisdiction and in the line of order, but cannot review the case on its merits."

We said in Crow v. Capitol City Council, 26 Pa. Superior Ct. 411, "Trials of such a character need not be conducted with absolute technical accuracy. It is sufficient if the proceedings are regular and conducted in good faith; the accused has been accorded a full and a fair hearing and a proper finding and judgment has been entered on the facts." And in Badger v. Council, 39 Pa. Superior Ct. 406, we said: "Organizations of this character cannot serve the purpose of their creation unless there is a strict disciplinary authority in the department having ultimate power to hear and decide, all controversies between grand and subordinate bodies. The decision of such a court of last resort must be accepted and obeyed, as representing what is best for the organization in interpreting the rules and regulations presented by their laws, and the civil courts will always incline to sustain them, and mere informality in the proceeding for removal will not justify interference by mandamus when it is evident that there are just grounds for expulsion, or that the accused has been acting in hostility to the organization. To encourage such insubordination by compelling the members and subordinate bodies to continue to receive among their active membership those who plot and scheme to disrupt the whole system would not only destroy its usefulness, but would be destructive of the whole organization. We have nothing to do with the merits of the controversy in Division No. 5, and are only concerned in

determining the law in regard to the rights and powers of the corporation, and the duty, responsibility and privileges of its members.

The conclusiveness of decisions of tribunals of this character is fully considered in the opinions of the courts and annotations thereto in Ryan v. Cuhady, 157 Ill. 108, 49 L. R. A. 353; Green v. Board of Trade, 174 Ill. 585, 49 L. R. A. 365; Supreme Lodge of Order of Select Friends v. Raymond, 57 Kan. 647, 49 L. R. A. 373; Baltimore & Ohio R. R. Co. v. Stankard, 56 Ohio, 224, 49 L. R. A. 381; Lawson v. Hewell, 118 Cal. 613, 49 L. R. A. 400.

After a careful review of the whole proceeding we agree with the finding of the learned trial judge that the meetings of the Division No. 5, held on November 2, and 27, were in all particulars regular and legal but we conclude that the insurgent and seditious meeting that was organized and held by these plaintiffs on December 7, 1910, was irregular, without any warrant, contrary to the rules and regulations of the Order, and null and void, and that these plaintiffs then participated in an offense which not only tended to, but did bring discredit upon and injure the Order. The effect of such insubordination and defiance of the orderly procedure of the Division's affairs would necessarily cause discord among the members and destroy the usefulness of the organization.

We further agree with the third conclusion of law, that the constitution and by-laws of the grand and supreme lodges of the various orders and societies of The Ancient Order of Hibernians are binding upon the members of the subordinate lodges, and add, that, the organization and holding of the unauthorized meeting of December 7, was subversive of an orderly and legal management of its affairs and destructive of the very aim and purpose of the Division, pledged "to exercise at all times its influence in the interests of right and justice"—and also, with the fourth conclusion of law that "The charter of Division No. 5, Ancient Order

of Hibernians incorporates the constitution and by-laws of the original Order, and by the terms of admission to Division No. 5 each member submitted himself to the rule and operation of these codes."

We are constrained to differ from the fifth conclusion of law, to wit: "The corporation defendant had no power under its charter to expel the plaintiffs for the acts complained of" and hold that it is not essential to sustain the conviction of these plaintiffs, because the charter does not specifically declare the right to expel from membership, one who has been properly convicted of "an offense which tends to bring discredit upon or injure the Order." We adhere to the principle announced more than a century ago in Commonwealth v. Society, 2 Binney, 448, "Every incorporation possesses inherently the power of expulsion in certain cases, because such power is necessary to the good order and government of corporate bodies"—and that the offense of which each of these plaintiffs was convicted was "against his duty as a corporator" and in that case he may be expelled on trial and conviction by the corporation. To hold otherwise would be to put a premium on lawless proceedings which would ultimately rend asunder the organization, "by compelling members and subordinate bodies to receive among their active membership those who plot and scheme to disrupt the whole system."

Nor can we agree with the sixth conclusion of law, to wit: "The trial and expulsion of the plaintiffs was in violation of the rules of the Order, was contrary to law, and is null and void." On examination of the record we find that the inception and holding of the meeting of December 7, was disloyalty to the Division No. 5, on the part of the members who took part in it, for the reason that they were present at, and participated in the meeting of November 27, at which time it was regularly decided to change the time and place of meeting, to a time and place fixed by the President, and that prior to December 7, they and each of them

had regular and proper notice (on November 19), that the next meeting of the Division No. 5, would be held on Sunday, November 27, for the purpose, inter alia, of "selecting the time and place for December meeting for election of officers" and again notified on December 3, "That the regular monthly meeting of Division No. 5, would be held on Sunday, December 11, at 2 o'clock P. M. in Temperance Hall, for the purpose of transacting the regular business, and also the annual election of officers."

The charges preferred against the plaintiffs by the trustees at the meeting held on January 4, 1911, "for conducting an illegal meeting and taking part in the same" and "for divulging the password" were declared by the President to be regular, and under the ritual adopted by the National convention, as provided by art. 39, sec. 5, of the constitution, the charges were handed to the standing committee with directions to report at as early a date as possible. This committee met on January 2, and 27, after giving to each of the parties notice on January 17, "to attend a meeting of the standing committee on January 20, as business of importance will be transacted," when written statements were made by a number of witnesses, and a written report of the proceedings made and taken by and before this standing committee. There being some doubt as to the receipt of notice of the charges by the plaintiffs, the standing committee held another meeting and again notified the parties on March 11, to appear before the standing committee "for the purpose of hearing and answering the above charges." No attention was given by the plaintiffs to any of these notices, and at a regular meeting on April 5, 1911, the committee made a written report reviewing their labors, formally affirming the action of the President's rulings in suspending the plaintiffs, and recommended that the penalty of expulsion be imposed, which was approved by the Division, and on April 8, following, the members were

regularly notified of their expulsion. No appeal was taken by any of the plaintiffs from the decision of the standing committee, or of the Division, to the county board, as was the right and privilege of anyone "aggrieved by the decision," when sec. 1, of art. 42, became operative. It is as follows: "Any aggrieved party failing to take an appeal from any action or decision within the time specified in these laws shall be bound by such action or decision and shall have no further recourse in law or equity in respect to the subject-matter of such action or decision." The next move taken by the plaintiffs was in the filing of this bill in equity on April 21, 1911.

At every step, from the inception of the proceeding the plaintiffs were afforded every opportunity of making a defense to the charges preferred against them. Notice after notice was ignored, hearing after hearing was avoided, and when the final action of the standing committee, and later on, of the Division was declared, they did not take an appeal to the proper tribunal for a further hearing of such matters.

In the main the proceedings are precise and conform to the charter and by-laws. The charges were set forth with sufficient certainty, the hearings regularly conducted after notice, and the decision reached was authorized by the rules of the Division No. 5: Society for Visitation of the Sick v. Commonwealth, 52 Pa. 125. The plaintiffs were convicted and sentenced in accordance of the law of the Division: Commonwealth v. Ger. Society, 15 Pa. 251. As the plaintiffs have made the record they stand convicted by a tribunal of their own selection. The courts entertain jurisdiction to keep these tribunals in the line of order, and to correct abuses, but they do not inquire into the merits of in rem judicatam in a regular course of proceeding: Commonwealth v. Union League, 135 Pa. 301. Gill v. Ben. Association, 36 Pa. Superior Ct. 458, is not applicable here in fact or principle, for the reason that in that case there were no charges preferred,

no notice given, no trial had or judgment entered on any matter involving the right of a member to continue in that relation.

It is suggested that there is no special assignment of error to the decree entered by the court, and under authority of Standard Soap & Oil Co. v. Degreasing Co., 232 Pa. 64, the judgment should be affirmed. There is special force in this contention, but as the case was exhaustively argued on its merits, there being seventeen assignments of error as to the findings of fact and conclusions of law, so that every phase of the case has been presented by counsel on each side, the omission, which could and would have been remedied at bar for permission to file a formal assignment, it is now treated as having been done, on the petition of counsel of appellant filed September 11, 1913, on account of the importance of the case, the questions involved and the number of parties interested. Every phase of the question was fully considered in the argument, and under the circumstances injustice rather than justice would be promoted by quashing the appeal. The decision of the court appearing in the record before us the practice in relation to taking an exception to the final order of the court, has been radically changed by the sixth section of the Act of May 11, 1911, P. L. 279, which provides as follows: " Whenever the decision of a court of record shall appear in the proceedings of a case, it shall not be necessary, for the purpose of review, to take any exception thereto; but the same shall be heard by the appellate court with the same effect as if an exception had been duly written out, signed, and sealed by the court." The decree in this case was entered February 3, 1912, and the omission to ask for a formal exception to the decree is cured by the act of 1911.

The decree of the court below is reversed, the bill dismissed at the costs of the appellees.